Joyce **HARLESS** et al.,
Plaintiffs-Appellants,

v.

Robert **DUCK** et al.,
Defendants-Appellees.

No. 77–3293.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 29, 1979.

Decided April 23, 1980.

Dorothy B. McCrory, Jeffrey Julius, Gallon, Kalniz & Iorio, Co., Toledo, Ohio, for plaintiffs-appellants.

Joseph P. Jordon, City of Toledo, Law Dept., Toledo, Ohio, for defendants-appellees.

Before LIVELY, BROWN and JONES, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

In this class action against the City of Toledo, Toledo Police Department (TPD), Toledo Civil Service Commission (TCSC), and several individual city officials, the district court found intentional discrimination in employment on the basis of sex in violation of the Fourteenth Amendment and 42 U.S.C. § 1983. After a bifurcated trial on the issue of liability only, the district court denied all relief to the named plaintiffs and the class members by holding that they had not established any injury and that the discrimination had ceased as of March 24, 1972, when Title VII, 42 U.S.C. § 2000e, was amended to apply to municipalities. Because many of the district court's conclusions of law are inconsistent with its findings of fact, we reverse and remand for proceedings on the appropriate remedy.

The named plaintiffs are women who took the November, 1972 patrolman's examination, the 1974 policewoman's examination, and/or the 1975 patrol officer's examination. Harless took all three examinations, but was never within appointing rank. Plaintiffs Hyatt and Gilford were within appointing rank on the 1975 test, but were not hired because of the TPD's effort

to hire minorities.[1] Plaintiff Vivian Butts was certified by TCSC for appointment on the basis of the 1972 test, but was not hired after an interview. She also took the 1975 examination. These named plaintiffs represent the certified class of all past and present female applicants to the TPD since 1965 and all past and present female employees of the TPD since 1965. Defendants do not contest the class certification.

From 1965 to 1975, only twelve women were employed by TPD in entry level classifications. In 1975, TPD employed 717 male police officers, one female police officer, and four policewomen. Until November 1974, TPD maintained separate entry level classifications for male and female officers: patrolman and policewoman. Before November, 1974, females were assigned only to the Crime Prevention Bureau/Juvenile Section and, before December, 1976, could not permanently transfer from this assignment. Consequently, because all promotions to divisions and supervisory ranks were made from uniform patrol, women were denied promotions, except within the Crime Prevention Bureau. At the time of trial in 1977, only one female police officer had achieved the rank of sergeant. Until the time of trial, no woman had ever been assigned to eleven bureaus, despite testimony by the then Chief of Police and the then Safety Director that women could perform those jobs.[2]

TPD was unable to hire anyone from 1969 until 1972, because of financial limitations. Being seriously understaffed, TPD, through TCSC, announced on March 1, 1972, a recruitment examination for "able ambitious young men" who desired to be patrolmen. TCSC cancelled the test on July 26, 1972, because of the questionable validity of the selection procedures under the EEOC guidelines. In September, 1972, TCSC again announced the examination for "able ambitious young men."[3] Despite the advertising, eighteen women applied for and took the examination. Two hundred sixty-three men also took the test.

The 1972 patrolman's examination consisted of three parts: 1) two written, general intelligence tests; 2) a physical ability test; and 3) a structured oral interview. The first two parts were graded on a pass-fail basis. The ranking of applicants was based solely on scores from the structured oral interview. The physical ability test had four parts, of which the applicants were required to complete three parts in order to pass: 15 push-ups, 25 sit-ups, 6-foot standing broad jump and 25-second obstacle course. The structured oral interview had 30 questions, designed to test communication skills, decisionmaking and problem-solving skills, and reaction to stress. A team of two interviewers graded answers on their degree of correctness. There were four teams of interviewers. Both the physical ability test and structured oral interview had a statistically significant disparate impact on female applicants.

1. TPD is no stranger in this Court. In *Afro-American Patrolman's League v. Duck*, 503 F.2d 294 (6th Cir. 1974), this Court affirmed the district court's ruling that the TPD discriminated on the basis of race in its promotion policies. Another lawsuit filed in the district court by other plaintiffs alleged racial discrimination in hiring. A consent decree was entered on November 25, 1974, which established an affirmative action program and minority recruitment. The district court retained jurisdiction and entered an order enforcing the consent decree, which this Court affirmed in *Sarabia v. Toledo Police Patrolman's Ass'n*, 601 F.2d 914 (6th Cir. 1979).

2. The change in attitude and policy between Police Chief Duck and Police Chief McGrath, who came to Toledo in 1974, is striking. In response to an inquiry from TCSC, Chief Duck declared that women were not to be assigned to uniform patrol or the selective enforcement task force. Therefore, TCSC administered in 1974 a separate recruitment examination for policewomen. Chief McGrath quickly demanded one examination for a single entry level classification of patrol officer. He started a recruiting program for women. Furthermore, he testified at trial that a number of cities had women on patrol in 1971.

3. Because the plaintiffs' class does not include prospective applicants, plaintiffs were not injured by this discriminatory advertising. Therefore, we do not consider TPD's advertising in this appeal.

Two hundred three persons were placed on an eligibility list after the 1972 test: 199 men and 4 women. Ninety-five men and one woman were hired.

TPD, through TCSC, gave a policewoman test in January, 1974. Though ten women were interviewed, none was hired because of a financial squeeze.

After TPD abolished the separate entry level classifications and established the single category of patrol officer, TPD, through TCSC, administered a test in July, 1975, for patrol officer. This test did not have a statistically significant disparate impact on women. Two hundred seventy-three of 1244 applicants (22%) were female. Twenty-nine males and seven females (19.4%) were hired.

## II

### Pre-March, 1972 Discrimination

On the basis of the statistics and policies discussed above, the district court found intentional employment discrimination of the basis of sex from 1965 until March, 1972 and held that this conduct violated the Fourteenth Amendment and 42 U.S.C. § 1983. The statistical evidence of discrimination is glaring and alone suffices to support the district court's findings. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 399, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977); *Detroit Police Officers Ass'n v. Young*, 608 F.2d 671, 686 (6th Cir. 1979). TPD had not conducted any comparison studies of the job performances of male and female police officers. Therefore, it is abundantly clear that the discriminatory policies in hiring, classification, assignment, and promotion were grounded on impermissible and archaic traditional stereotypes. *See City of Los Angeles, Dept. of Water v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 1375–76, 55 L.Ed.2d 657 (1978).

## III

### Post-March, 1972 Discrimination

The district court held that defendants did not violate Title VII, since all discrimination had ceased as of March 24, 1972. In making this determination, the district court focused on the validity of the 1972 examination. Because the test was found valid and job-related according to EEOC guidelines, 29 C.F.R. 1607.1, *et seq.*, defendants were absolved of any Title VII violation.

The district court's ruling is erroneous as a matter of law, regardless of the validity of the 1972 examination. Though discriminatory acts occurring before March 24, 1972 do not contravene Title VII, *Hazelwood School District v. United States*, 433 U.S. 299, 309, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977), those acts are very probative evidence of the existence of post-March, 1972 discrimination, especially where the defendants' decisionmaking apparatus changes so little, as with TPD. *Id.* at 309 n.15, 97 S.Ct. at 2742; *Detroit Police Officers Ass'n v. Young*, 608 F.2d at 688. TPD continued the same discriminatory policies in hiring, classification, and promotion until November, 1974, in transfers until December, 1976, and in assignments until the time of trial. The facts as found by the district court compel the conclusion that the discrimination did not cease as of March 24, 1972. Because not all of defendants' employment decisions after March 24, 1972 were made in a wholly nondiscriminatory way, defendants did not present a legitimate defense to the Title VII claim. *Detroit Police Officers Ass'n v. Young*, 608 F.2d at 688. The discriminatory practices continued far too long after Title VII was amended to apply to municipalities.[4]

---

4. Because the discriminatory practices continued for up to five years after the amendment of Title VII, we need not address the question of whether Title VII allows the municipalities a grace period in which to achieve compliance. *See Blake v. City of Los Angeles*, 595 F.2d 1367 (9th Cir.), *cert. pending* (1979).

We also need not address the question of whether any fair and neutral practices operated impermissibly to freeze the status quo reflecting past discrimination. *See International Brotherhood of Teamsters v. United States*, 431 U.S. at 349, 97 S.Ct. at 1861. We note that in *Afro-American Patrolmen's League v. Duck*,

Moreover, the district court erred in declaring the 1972 examination valid and job-related. TCSC developed the 1972 examination in conjunction with an industrial psychologist experienced in police selection. TCSC attempted to formulate a test that would be content and construct valid.[5] A job analysis was first prepared based on interviews with police officers and on personal observation. The job analysis defined the functions and demands placed on police officers.

The major flaw with the 1972 examination was the physical ability test. Defendants argued that the physical ability test was necessary because the height and weight requirements had been abolished. Undoubtedly, police officers must meet certain physical standards to be capable of performing their jobs safely and effectively. However, this obvious fact does not relieve defendants of their duty to formulate a nondiscriminatory test.

Defendants did not meet their burden of proving that the test was valid and job-related.[6] First, the job analysis discloses the need for some physical activity on the job, but does not specifically define the amount of physical strength or extent of physical exertion required. *Dothard v. Rawlinson*, 433 U.S. 321, 331–32, 97 S.Ct. 2720, 2727–28, 53 L.Ed.2d 786 (1977). As an

official of TCSC stated, the test was developed through an "intuitive process." Hearing on Preliminary Injunction, p. 92. Second, the test was taken from the physical condition test in the manual on selection of public employees published by the Public Personnel Association. Tr. 107. The test had been used previously in other cities, but had never been validated. Defendants did not begin to attempt to validate the physical ability test until 1974, App. 28, Stipulation No. 127, and lacked any information before then on which to validate the test.[7] Third, there is no justification in the record for the types of exercises chosen or the passing marks for each exercise. Finally, after further study in 1974, the physical ability test was deleted from the 1975 examination, apparently with no detrimental effect on the police department. *Blake v. City of Los Angeles*, 595 F.2d at 1382. Therefore, we hold that the physical ability test was not job-related and contravened Title VII.

The structured oral interview is also suspect. Both David Boston, the TCSC official who developed the test, and Russell Strasbaugh, the graduate student who prepared the validation study on the structured oral interview, admitted that the job analysis lacked objectivity and was not systematic. The interview related only to training

---

503 F.2d 294 (6th Cir. 1974), this Court rejected a similar defense by the same defendants on the ground that the use of an examination coupled with promotion rules operated to perpetuate past discrimination.

5. The employer may use any of three methods to validate an examination: criterion validity, construct validity or content validity. *Washington v. Davis*, 426 U.S. 229, 247 n.13, 96 S.Ct. 2040, 2051 n.3, 48 L.Ed.2d 597 (1976); *Firefighters Institute for Racial Equality v. City of St. Louis*, 549 F.2d 506, 511 (8th Cir.) *cert. denied*, 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977). Criterion validity compares evaluations of employees' job performances with test scores. Construct validity determines the degree to which applicants possess traits which are considered important for the job. Content validity assesses the ability of the applicants to perform specific tasks which must be performed on the job. TPD attempted to prove construct and content validity because there was an inadequate sample and insufficient time

to perform the predictive criterion validity. The District Court found criterion validation to be impracticable.

6. The burden of proof in a Title VII action shifts: first, plaintiff must establish a prima facie case by demonstrating disparate impact or disparate treatment; then, defendant can rebut by establishing a defense, such as, business necessity, for example, that the test bears a manifest relationship to successful and efficient job performance; finally, plaintiff can establish liability, despite a valid defense, if an alternative selection device not creating the disparate impact can be proven. *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

7. For these reasons, the examination cannot be a valid interim test under 29 C.F.R. § 1607.9.

performance at the police academy and not to actual job performance; consequently, it is deficient as a matter of law. *Blake v. City of Los Angeles*, 595 F.2d at 1382. Moreover, Strasbaugh stated that the relevance, reliability and overall worth of the individual academy measures of performance could not be established and he questioned the existence of a relationship between success in training and success on the job. *See United States v. City of Chicago*, 549 F.2d 415, 430 (7th Cir.) *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). Boston and Strasbaugh agreed that the grading of the interviews was subject to a host of errors resulting from a lack of standardized conditions, rater bias, and the lack of criteria on which to judge the degree of correctness of answers. These problems overwhelm Strasbaugh's ultimate conclusion of validity. We conclude that the structured interview was rife with the potential for discrimination and is not job-related. *Senter v. General Motors Corp.*, 532 F.2d 511, 529 (6th Cir.), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976); *Afro-American Patrolmen's League v. Duck*, 503 F.2d at 301.

Finally, defendants could have avoided using the discriminatory and invalid portions of the examination. Plaintiffs and Strasbaugh suggested that better alternative bases for selection were biographical data and the written intelligence tests. The written intelligence tests did not have a statistically disparate impact between males and females. Therefore, even if the test had been job-related, TPD would have violated Title VII by not using alternative selection procedures having a less disparate impact between male and female applicants.

■ It must be remembered that defendants postponed the 1972 examination once in order to devise a test consistent with EEOC guidelines. Defendants knew their responsibilities and potential liability. Though defendants may have searched diligently for a valid examination and were hampered by the infancy of sophisticated testing techniques, their use of an unlawful

examination cannot be excused. Therefore, we hold, contrary to the district court, that the 1972 examination was not job-related according to Title VII standards.

Defendants' sole defense to the Title VII claim was that the discriminatory policies and practices had ceased as of March 24, 1972. Because defendants' discriminatory practices and policies continued for well over two years after the applicability of Title VII and because the 1972 examination was not job-related, we hold that defendants did violate Title VII.

## IV

### *Injury to Plaintiffs*

■ From our discussion above, it is apparent that the named plaintiffs and class members were injured by defendants' discriminatory acts including the invalid 1972 examination. Even if the district court had been correct in declaring that the named plaintiffs had not established their injuries, the case should not have been dismissed. The lack of injury to named plaintiffs does not moot the injuries to class members. *Franks v. Bowman Transportation Co., Inc.*, 424 U.S. 747, 754, 96 S.Ct. 1251, 1259, 47 L.Ed.2d 444 (1976), *citing with approval, Roberts v. Union Co.*, 487 F.2d 387 (6th Cir. 1973). Therefore, the district court should have considered the injuries, if any, to class members before denying all relief on the Fourteenth Amendment claim.

■ The district court also erred in finding an absence of discrimination in internal employment practices because there was no evidence that any woman in the TPD had ever sought and been denied assignment to divisions other than the Crime Prevention Bureau/Juvenile Section. Such testimony may be necessary at the trial on remedy in order to grant individual relief, *International Brotherhood of Teamsters v. United States*, 431 U.S. at 343 n.24, 97 S.Ct. at 1858 n.24, *Franks v. Bowman*, 424 U.S. at 772–73, 96 S.Ct. at 1267–68, but it is certainly not required at the liability stage, after plaintiffs have presented overwhelming evidence of pervasive discrimination in

all aspects of TPD's internal employment practices. TPD's policies had been engraved in stone since the 1920's. Every woman on the police force and every woman interested in becoming a member of TPD knew her restricted role.[8] Even when TCSC inquired to Chief Duck in 1973 about a change in the role of women, he declined to change classifications. Any protest or application for an assignment outside the Crime Prevention Bureau/Juvenile Section would have been futile and perhaps also foolhardy. Consequently, liability can be found without the need for evidence of such futile gestures. *Dothard v. Rawlinson*, 433 U.S. at 330, 97 S.Ct. at 2727; *Mitchell v. Mid-Continent Spring Co. of Kentucky*, 583 F.2d 275, 281 (6th Cir. 1978), *cert. denied*, 441 U.S. 922, 99 S.Ct. 2030, 2031, 60 L.Ed.2d 396 (1979). ("The standard [in] this Circuit under Title VII is that females must have *equal employment opportunities*, not merely that their applications, if any, be processed fairly.") We hold that defendants' internal employment practices before March, 1972 violated the Fourteenth Amendment and 42 U.S.C. § 1983, and that the continuation of the same practices and policies after March 24, 1972 violated Title VII.

V

The district court dismissed the City of Toledo as a party-defendant. In light of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the City of Toledo must be reinstated as a party. Upon remand, the district court must determine whether or not the City of Toledo is liable for any of the discrimination against plaintiffs. Explicit factfinding is necessary, since the principle of *respondeat superior* cannot be applied. *Id.*

VI

*Relief*

Because the district court bifurcated the trial and never heard evidence on

remedy, we remand the case for remedial proceedings. The delay in providing a remedy for plaintiffs has already been lengthy. Therefore, we expect that the district court will make every effort to expedite the remedial proceedings.

Certainly many events have occurred within TPD since March 24, 1972. The district court found that defendants had voluntarily ceased their discriminatory practices and policies. We have held today that the discrimination did not cease soon enough. Good faith, which hopefully does exist, cannot shield a party from liability for the prolonged continuation of discriminatory practices and policies. Similarly, good faith or a voluntary effort to correct past discrimination does not preclude the award of affirmative relief, though each is a factor to be considered. *EEOC v. New York Times Broadcasting Service, Inc.*, 542 F.2d 356, 361 (6th Cir. 1976); *United States v. International Brotherhood of Electrical Workers, Local No. 38*, 428 F.2d 144 (6th Cir.), *cert. denied*, 400 U.S. 943, 91 S.Ct. 245, 2 L.Ed.2d 248 (1970). At this point in time, we would be premature in discussing the necessary scope of the remedy. Therefore, we simply remand to the district court for trial on the appropriate remedy.

As plaintiffs have prevailed in establishing defendants' liability, the district court must also consider on remand the amount of reasonable fees for plaintiffs' attorneys for their work in the district court and court of appeals. 42 U.S.C. §§ 1988, 2000e–5(k). The costs of this appeal shall be assessed against the defendants.

The judgment of the district court is reversed and remanded for proceedings consistent with this opinion.

---

8. A female police officer, hired in 1972 and later assigned to recruiting, testified that many women did not want to become "policewomen" because of the separate entry level classification and the limited duties.