Kathleen JATCZAK, Plaintiff,

v.

Frank OCHBURG, Director, Department of Mental Health, State of Michigan, and Richard A. Ross, State Personnel Director, Civil Service Department, State of Michigan, Defendants.

Civ. A. No. 80–74606.

United States District Court,
E. D. Michigan, S. D.

June 10, 1982.

Dennis James, Detroit, Mich., for plaintiff.

Frank J. Kelley, Atty. Gen. by Robert S. Welliver, Asst. Atty. Gen., State Affairs Division, Lansing, Mich., for defendants.

## OPINION

GILMORE, District Judge.

This case raises serious questions as to when an employer may assert a bona fide occupational qualification to restrict the hiring of persons to one sex. The action is brought under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.) The plaintiff is a female who claims she was discriminated against because of her sex. Defendants admit they would not accept plaintiff's application for the job in question, but claim there was a bona fide occupational qualification that required the job to be filled by a male.

The Court finds that the defendants have not established the affirmative defense of bona fide occupational qualification and will enter judgment for the plaintiff.

I

On June 5, 1977, defendants ran a newspaper ad in the Detroit News which stated the following:

### Child Care Worker

Sheltered work shop and community mental health program for young adults. One (1) year of college (28 semester hours), present college enrollment or fall college enrollment required. Contact Mr. Lee at 491–3200.
AN EQUAL OPPORTUNITY EMPLOYER.

On June 6, 1977, plaintiff called the telephone number given in the advertisement and spoke to Mr. William Lee, an employee and agent of defendants. Mr. Lee informed the plaintiff the job was restricted to men only and said she could not be considered for the job. There is a dispute of fact as to whether he suggested she call the Civil Service Commission to get on a Civil Service list, but the resolution of that fact is not necessary for decision.

Plaintiff met the advertised qualifications for the job and all objective criteria for the job, which was that of Child Care Worker 03. The job was located in the Sheltered Workshop of the Youth Counseling Center West (YCCW) of the Michigan Department of Mental Health. YCCW was an outpatient facility of the Michigan Department of Mental Health servicing male and female outpatients between the ages of 17 and 21. The outpatients were mentally ill as opposed to mentally retarded, and many of the patients at YCCW were ex-inpatients of the Harreld Center for Young Adults of the Northville State Hospital.

The basic purpose of YCCW was to prevent rehospitalization of clientele who were in various stages of mental illnesses, and this was accomplished through a series of programs designed to be individually suited for each client. All clients were assigned therapists, and some received drug therapy. Some only attended for therapy or drugs while others attended a day treatment program which involved many other activities, including athletics, academics, occupational therapy and work activities. The staff of YCCW was mixed male and female, with male staff members being on the premises at all times; there was no policy of assignment of clients to therapists according to sex.

The Sheltered Workshop was designed to teach work skills and appropriate work behavior to mentally ill young adults so that they could more easily obtain employment in the outside world. The work skills taught were those associated with manual assembly of small objects such as toys, cardboard boxes, and small appliances. Clients were taught appropriate work behavior, including characteristics such as concentration, patience, self discipline and organization, appropriate dressing, and acceptable behavior with fellow workers and supervisory staff. The workshop classes lasted 50 minutes, and some clients were assigned to more than one class. In addition, they were assigned to other parts of the day treatment program. The client population of the workshop was between 8 and 25, and typically was at least 95 percent male, and mostly black.

Although, from time to time, questions that required minor counseling would come up in the Sheltered Workshop relating to things such as sexuality and the like, counseling was not one of the duties of the staff of the Workshop, and, where there were any counseling problems, the clients were to be referred to the counseling section of YCCW, and to their own assigned therapist.

At the time in question, June 1977, the workshop was staffed by one female Child Care Worker 05, the supervisor of the Workshop, and one male child care worker. There was a vacant position classified as Child Care Worker 03. The vacancy in question had been created by the departure of a male child care worker.

Mr. Lee, Director of YCCW in June of 1977, requested and received permission from the Department of Civil Service to selectively certify the vacant position in question as "male only." The selective certification was based on a rationale contained in a memo submitted by the Department of Mental Health to the C.S.C. on May 3, 1977. The reasons for limiting the position to males consisted principally of the following:

1) It was necessary to have a male role model for the predominately male Workshop patient population to provide modeling for appropriate work behavior, which for males could only be provided by a male.

2) It was necessary to have a male in the workshop at all times to provide counseling in advance to male patients on topics of sexuality and sexual development.

3) The background of many of the male patients, particularly the black male patients who were in the workshop, involved family settings in which there was no father or other significant male. Therefore it was necessary to provide a male role model.

4) The family background of many of the male patients, particularly the black ones, involved negative experiences with females in positions of authority, and this would cause intolerance on their part to behavior modeling instruction and discipline imposed by female workers in the workshop area.

The principal witnesses for the defendant were William Lee, who had a Masters Degree in Social Work and was the director of the YCCW, and W. Rowan Sanders, M.D., who was a psychiatrist and the Director of the Harreld Center for Young Adults, an inpatient facility of the Northville State Hospital. It should be noted that many of the clients of YCCW were ex-inpatients at the Harreld Center. Both of them testified that it was absolutely essential that the position in question be filled by a male. They indicated that their opinion, which formed the basis for the request for selective certification, derived from their experience and the experience of other institutional heads at the Northville State Hospital and surrounding mental health complexes.

They also stated that, in their experience, mentally ill young black males of the ages in question tended to test female staff more than male staff, and they concluded it was necessary to have a male in the position to provide a role model for the clientele inasmuch as clients would not model their skills and appropriate behavior from a female. They admitted that there was no documentation of the testing phenomenon they alluded to, and no documentation of any preference of young black male clients for male staff. They cited no authorities other than the Northville staff in support of their general assumptions that a male was necessary for this position. They had made no tests to support their assumptions, and admitted that if the male Workshop participant needed counseling, he could always obtain it from trained counselors at the YCCW. In fact, counseling was not a function of the Sheltered Workshop of the YCCW.

Rebuttal of defendants' testimony was offered by plaintiff's expert witnesses. The first was Professor David Wineman, a member of the faculty of the Wayne State University School of Social work and an expert in the subject of human development. Dr. Wineman opined that it was not necessary to classify the position in question as male only, and drew upon his experience as director of the Fresh Air Camp, a residential treatment center for disturbed young people, his consultant work with the Detroit Psychiatric Institute, his private practice and associations with student and staff social workers, and his general body of learning associated with his teaching duties. He testified that sex was not justified as a dominant consideration in setting forth the qualifications for the job in question. He indicated rather that commitment, maturity, training, compassion, sensitivity, and other qualities were the appropriate considerations for choice of staff in such positions, and attacked the assumptions of Mr. Lee and Dr. Sanders regarding absent males in the background of their clientele and the resultant hostility to females. He portrayed such assumptions as unfounded

stereotypes, which studies since the early 70's have shown to be substantially unsupported, and described the extended family network of young urban blacks which provide generally appropriate male role models. He cited numerous authorities who agreed with his analysis of urban black life and family structure.

The second expert for the plaintiff was Thomas Dolan, Director of the Beacon Day Treatment Center in Romulus, Michigan, who was an expert in the design and staffing of day treatment centers and residential treatment centers. He, too, stated that there was no basis for sex discrimination in the establishment of this job, and based his opinion principally upon his experience in designing, directing and staffing day treatment centers for disturbed young people in the state of Michigan. He also based his opinion on his experience as designer and director of the Epic Center Program at Northville State Hospital, and stated that, based upon his experience there, there was no direct correlation between the sex of his staff and their effectiveness as counselors, teachers, and group leaders.

Plaintiff's final expert was David Schwartz, M.D., a psychiatrist with experience in pediatrics and counseling of young persons and young adults. He stated that role modeling was most typically accomplished from mothers or female heads of families, even when males were present, and listed as important factors in hiring decisions the same as those listed by witness Wineman, adding his opinion that decisiveness or non-ambiguity was another important factor. He stated clearly that there was no basis for a gender classification of the Child Care Worker 03 in the instant case.

## II

■ Plaintiff has unquestionably made out a prima facie case of discrimination under § 703(a) of Title VII, 42 U.S.C. § 2000e–2(a) (1976).[1] Plaintiff met all of the published qualifications for the job of Child Care Worker 03, and defendants admittedly refused to allow plaintiff to apply for the vacant position in YCCW solely because of her sex.

Once a prima facie case of sex discrimination is established, the employer must meet the burden of showing that sex is a "bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." Section 703(e) of Title VII, 42 U.S.C. § 2000e–2(e) (1976).[2]

■ The bona fide occupational qualification (BFOQ) defense is "an extremely narrow exception" to the prohibitions against sex based discrimination. *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). In *Dothard, supra,* the Supreme Court apparently accepted the severely limited BFOQ test developed by the various federal courts:

The district court rejected the bona fide occupational qualification (BFOQ) defense, relying on the virtually uniform view of the federal courts that § 703(e) provides only the narrowest of exceptions to the general rule requiring equality of employment opportunities. This view has been variously formulated. In *Diaz v. Pan American World Airways*, 442 F.2d 385, 388 [5th Cir.], the Court of Appeals for the 5th Circuit held that "discrimination based on sex is valid only when the

---

**1.** Section 703(a)(1) states:
 (a) EMPLOYERS. It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...

**2.** Section 703(e) states:

(e) Notwithstanding any other provision of this subchapter,
(1) It shall not be an unlawful employment practice for an employer to hire employees ... on the bases of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise...

*essence* of the business operation would be undermined by not hiring members of one sex exclusively." (Emphasis in original). In an earlier case, *Weeks v. Southern Bell Tel. & Tel. Co.*, 408 F.2d 228, 235 [5th Cir.], the same court said that an employer could rely on the bfoq exception only by proving "that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved." See also *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 27 L.Ed.2d 613, 91 S.Ct. 496. But whatever the verbal formulation, the federal courts have agreed that it is impermissible under Title VII to refuse to hire an individual woman or man on the basis of stereotyped characterization of the sexes... We are persuaded—by the restrictive language of § 703(e), that relevant legislative history, and the consistent interpretation of the Equal Employment Opportunity Commission—that the bfoq exception was in fact meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex. 433 U.S. at 333–34, 97 S.Ct. at 2728–2729.

■ The existence of a legitimate BFOQ defense thus depends on whether discrimination is compelled by business considerations. This Court must determine the answers to the three broad questions apparently sanctioned by the Supreme Court in *Dothard, supra.*

■ In order to sustain their BFOQ defense, the defendants in this case must show that the essence of the workshop program in YCCW would have been undermined by not selectively certifying the job as "male only". Second, the defendants

must prove that there is reasonable cause to believe that all or substantially all women would be unable to perform the job safely and efficiently. Finally, the employer must show that selective certification was based on actual sexual characteristics rather than on stereotyped assumptions.[3]

The Court must therefore carefully scrutinize defendants' justification for restricting the position in question to males only.

Defendants strongly assert that a male child care worker was essential to the workshop program because the predominately male clientele could identify with a male staff member. Mr. Lee and Dr. Sanders both testified that a male role model was necessary because, as a rule, the male clients lacked male parents or significant male personalities with whom to identify. Defendants claimed that, because of their sub-cultural background, the clients would refuse to accept instruction or discipline from females. A male child care worker was also necessary, according to defendants, for counseling patients about their gender and sexual interactions.

The defendants seem to be arguing that a "male only" restrictor was justified here because of their clients' needs and preferences. Courts have consistently rejected the argument that stereotyped customer preferences justify discriminatory practices. *See Diaz v. Pan American World Airways, Inc.*, 442 F.2d 385 (5th Cir. 1971). (Fact that airline passengers prefer female flight attendants was not BFOQ). In *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273 (9th Cir. 1981), for example, the defendant employer chose not to promote a female employee because the company's Latin American clients would react negatively to a woman vice-president for International Operations.

---

**3.** There is also a possible fourth criteria. In *Harless v. Duck*, 619 F.2d 611 (6th Cir. 1980), the Court discussed *Dothard* and found that the BFOQ defense is not available if there was some less restrictive alternative available to the employer that could have avoided the sex classification.

The court stated:

The burden of proof in a Title VII action shifts: first, plaintiff must establish a prima

facie case by demonstrating disparate impact or disparate treatment; then, defendant can rebut by establishing a defense, such as, business necessity, for example, that the test bears a manifest relationship to successful and efficient job performance; finally plaintiff can establish liability, despite a valid defense, if an alternative selection device not creating the disparate impact can be proven. 619 F.2d at 616 n.6

The court found that masculine gender was not a BFOQ because the record lacked a factual basis for linking sex with job performance. The court also held that even if the factual record supported the defendant's BFOQ defense, the employer would be in violation of Title VII because "customer preference based on sexual stereotype cannot justify discriminatory conduct." 653 F.2d at 1277.

But, the defendants say they are not attempting to justify their refusal to hire plaintiff on a whimsical stereotyped characterization. Rather, the defendants contend that a male was necessary to effectively provide services and fulfill their clients needs.

■ While the ability to effectively teach patients, or to provide sex-role models or sex education, might, in some situations, justify a preference for one sex,[4] the defendants have failed to sustain their burden of proving that a male child care worker was necessary to the essential function of the workshop.

Defendants themselves admit that role modeling and informal instruction and discussion of gender-related questions were merely ancillary functions of the child care worker position. Mr. Lee testified that the primary role of the staff member in the workshop was to insure the day-to-day functioning of the workshop, to teach the various work skills, and to keep track of the clients' work time. Dr. Sanders testified that the job consisted of performing the tasks to find out how long they took so that the patients' time could be prorated, keeping tabs on production and work habits, illustrating work habits and maintaining order and discipline. Dr. Sanders testified that counseling was inherent in the job because the child care worker was supposed to teach proper conduct. Dr. Sanders testified that the job did not involve formal counseling but that questions related to sex or bodily functions might come up as part of the day-to-day interaction between the patient and the child care worker. Dr. Sanders and Mr. Sarcus (by deposition) both stated that, if problems came up, the clients would be referred to therapists.

The Court finds that the essential purpose of the workshop was to teach work skills and appropriate work behavior. Counseling and therapy were not provided by the child care worker. The child care worker had no responsibility for intimate body contact with the clientele. Any counseling provided by the worker was purely incidental.

The Court is convinced that the testimony of plaintiff's witnesses Wineman and Schwartz clearly indicate that the ability to transmit knowledge of work skills and appropriate work behavior is not a function of the gender of the counselor. It is clear that the required manual skills, as well as desirable characteristics of concentration, punctuality, appropriate dress, self discipline, and cooperation can be conveyed and modeled by a qualified female worker as well as a male to clients of either sex.

The Court is not convinced by the testimony in this case of the necessity of a male role model for the clients of the YCCW in the Sheltered Workshop, most of whom, of course, were young black males. The type of racial stereotyping testified to by defendants' experts simply was not supported by any hard evidence, and was firmly disputed by plaintiff's experts.

It appears to the Court that none of defendants' reasons for restricting the Child Care Worker 03 to males can be justified as a bona fide occupational qualification. The record developed in this case makes it perfectly clear that gender plays no significant role in the ability of a person to properly supervise the clientele of the Sheltered Workshop. Since there was no bona fide

4. For example, in E.E.O.C. Decision No. 76–130, (August 10, 1976) 2 Empl.Prac.Guide (CCH) ¶ 6692 (1980), the agency found that sex was a BFOQ for counseling the mentally handicapped. In that case, the counselors were responsible for holding sex education and individual counseling sessions divided by sex. Counselors were also needed to help clients with toilet training, dressing, consultation about sexual behavior, and to provide appropriate sex-role models.

occupational qualification in 1977 requiring the hiring of only males for the position, plaintiff is entitled to relief.

### III

Finally we turn to the question of proper relief for plaintiff. Defendants cannot be ordered to place plaintiff in the position which she sought because the Youth Counseling Center West has been abolished due to budgetary considerations and the position no longer exists. The person who obtained the job, Mr. Sarcus, has been laid off.

■ Plaintiff's first request is that she be placed on an eligibility list for rehiring to this job under the same standards that Mr. Sarcus would be placed on such a list. Such a result is not indicated and cannot be approved because Mr. Sarcus was promoted to the position of Child Care Worker 05 and there is nothing in the record to indicate that plaintiff would qualify for the position of Child Care Worker 05. There is also no showing in the record that the position Child Care Worker 03 still exists. Therefore the Court cannot and will not order that the plaintiff be placed on any eligibility list for callback, should positions open up again.

Plaintiff, therefore, is restricted in her recovery to a dollar amount that will adequately compensate her for the loss suffered because of the discrimination practiced against her.

Plaintiff's exhibit 8 received in evidence is a summary of an itemized statement of damages and lost wages claimed. It totals $49,477.84. Plaintiff testified that during the period of time involved, she earned approximately $6,000 and diligently tried to obtain other employment. If one subtracts the $6,000 earned from $49,477.84, the net figure is $43,477.84. In addition, plaintiff claims that exhibit 8 only goes to March 15, 1982, and that the testimony in the record shows that Mr. Sarcus was employed until May 1, 1982. She therefore claims that an additional $3,304 should be added to this figure, giving a total damage figure of $46,781.84. The additional $3,304 is the amount earned by Mr. Sarcus from March 15, 1982 until May 1, 1982, when he was laid off.

The assessment of damages in this type of a Title VII case is a difficult problem. It is clear that there is a public policy overlay in assessing damages so that a strict causation test will not apply. Were one to apply a strict causation test, it could be argued that plaintiff had not proved that she would have been hired had she not been discriminated against and if other better qualified persons had come along. It could therefore be argued that she has suffered no damages. But not even defendant goes this far. Defendant recognizes that if plaintiff is entitled to recover, she is entitled to some damages. The question is how much.

In discussing the matter, the Supreme Court said in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975):

> It follows that, given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination. The courts of appeals must maintain a consistent and principled application of the backpay provision, consonant with the twin statutory objectives, while at the same time recognizing that the trial court will often have the keener appreciation of those facts and circumstances peculiar to particular cases.

*Id.* at 421–22, 95 S.Ct. at 2373.

In considering the matter in a slightly different context, the Fifth Circuit, in *Baxter v. Savannah Sugar Refining Corp.*, 495 F.2d 437 (5th Cir. 1974) said this:

> [O]n remand, the initial burden will be on the individual discriminatee to show that he was available for promotion and possessed the general characteristics and qualifications which are shown by Savannah to be possessed by the higher paid white employees and are job related. Once this burden is met, the employer

must demonstrate by clear and convincing evidence that any particular employee would have never been advanced because of that individual's particular lack of qualifications for a more difficult position or for other good and sufficient reasons such employee would never have been promoted. It is apparent that whether any particular individual would have been advanced under a color-blind system cannot now be determined with 100% certainty. The court on remand will have to deal with probabilities. Any substantial doubts created by this task must be resolved in favor of the discriminatee who has produced evidence to establish a prima facie case. The discriminatee is the innocent party in these circumstances.

*Id.* at 444–45.

With this law in mind, it is clear that the plaintiff's claim for recovery is valid. Defendant has come forward with no clear and convincing evidence that plaintiff would never have been appointed to the job had she not been a victim of discrimination. In fact, no evidence has been offered on that issue except a stipulation by parties that plaintiff met the minimum qualifications for the job. As pointed out in *Baxter*, any substantial doubts created must be resolved in favor of the person discriminated against who has produced evidence to establish a prima facie case. Such evidence has been produced in this case and there has been no sufficient rebuttal to cause rejection of her claim.

While plaintiff must mitigate the damages, the defendant bears the burden of establishing that the damage suffered by plaintiff could have been avoided and that there were suitable positions available which the plaintiff could have discovered and for which she was qualified, and that she failed to use reasonable care and diligence in seeking such a position. In *Sias v. City Demonstration Agency*, 588 F.2d 692 (9th Cir. 1978), Court said:

> To satisfy this burden, defendant must establish (1) that the damage suffered by plaintiff could have been avoided, i.e. that there were suitable positions available

which plaintiff could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position (citing cases).

*Id.* at 696–97.

Here the defendant offered no evidence that the damage suffered by plaintiff could have been avoided. In fact, the record is quite the opposite. Plaintiff herself testified that she had sought various types of positions and that the most she had been able to earn in the crucial period was $6,000. Therefore, defendant has not carried the burden of showing that plaintiff could have further mitigated her damages. Plaintiff's damage claim should be reduced by $6,000, which is the amount she admittedly earned during the relevant time period. Therefore she is entitled to damages of $46,781.84.

Plaintiff may present a judgment in the amount of $46,781.84, and plaintiff's attorney may file a proper petition for assessment of attorney fees. Costs will be awarded plaintiffs.

This opinion shall constitute the findings of fact and conclusions of law required by F.R.C.P. 52(a).