849 F.2d 608
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Kevin BALOGH; Gregory Jankowski; Anthony A. Cisterino,
Plaintiffs-Appellants,
v.
CITY OF TOLEDO, Defendant-Appellee.
 Nos. 87-3555, 87-3556.
 United States Court of Appeals, Sixth Circuit.
 June 16, 1988.
 
 N.D.Ohio
 AFFIRMED.
 On Appeal from the United States District Court for the Northern District of Ohio.
 Before ENGEL, Chief Circuit Judge, and KEITH and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Plaintiffs, three applicants for the City of Toledo's 1985 police officer class, scored well on the City's written examination but were excluded from the class based upon their low background investigation scores. Plaintiffs claimed that they were excluded from the class because they are white males and filed Title VII actions challenging the City's testing procedure. The Toledo Police Department administered the test in accordance with the terms of a consent decree previously entered in the case of Sarabia v. Duck, sub nom. Gonzales v. Mason, No. C72-263 (N.D.Ohio 1974), aff'd sub nom. Sarabia v. Toledo Police Patrolman's Ass'n, 601 F.2d 914 (6th Cir.1979). The central questions on appeal are: (1) whether plaintiff's claims constitute impermissible collateral attacks upon the Sarabia v. Duck consent decree, and (2) whether plaintiffs have stated prima facie Title VII claims. The district court answered both questions in the negative and granted the City's motion for summary judgment. We affirm.
 
 I.
 
 2
 In 1972, a class of blacks and Hispanics sued the City of Toledo Police Department, claiming that the Department, through discriminatory practices in its recruitment, examination, and hiring processes, excluded blacks and Hispanics from the police force. The parties entered into a consent decree in 1974, which expressed the City's commitment "to the concept of affirmative action to erase any vestiges of past employment discrimination within its municipal government...." Sarabia v. Toledo Police Patrolman's Ass'n, 601 F.2d at 915.
 
 
 3
 The significant requirements of the consent decree are that validated examinations be used in testing applicants for appointment to the police force and that the City engage in a comprehensive affirmative action and minority recruitment program.
 
 
 4
 Id.[1] The district court expressly retained jurisdiction under the terms of the decree and entered an order in 1978 modifying the decree by temporarily suspending the department's use of the so-called "rule of three"[2] to meet its commitment under the decree. In 1985, the parties, with the district court's approval, modified the decree by abandoning the rule of three and adopting an alternative method of certification known as the "banding" method.
 
 
 5
 Under the banding method, a single hiring list of relatively equally qualified candidates is compiled. The Department requires that candidates first pass a written as well as a medical and psychological examination. Those individuals who score within a thirteen point range of the highest score on the written examination and who pass the medical and psychological examinations are given a background investigation. Under the background investigation, a candidate can be assessed a negative point score based upon any or all of the following personal factors: unstable work history, lack of minimal requirements (high school degree and a valid Ohio operator's license), dishonesty, lack of punctuality, a history of violent behavior, prior incidents of irresponsible behavior, or prior incidents of other atypical behavior. The applicants are then ranked in descending order according to their scores on the background investigation. Accordingly, the lower the candidate's "negative score," the less likely that the candidate will be included in the final hiring list.
 
 
 6
 Plaintiffs in these consolidated cases are applicants for the recruiting class hired by the City in September of 1985. All three plaintiffs are white males who successfully completed the written, medical, and psychological examinations, but who failed to qualify for slots in the 61-member class allegedly because of low scores on their background investigations. Approximately 2,500 applicants took the 1985 written examination. Plaintiff Balogh had the second highest score. Plaintiffs Cisterino and Jankowski scored 25th and 52nd, respectively.
 
 
 7
 The background investigation scores of the 64 successful applicants (three alternates were also selected) ranged from a high of "0" to a low of "-16." Balogh's background investigation score was "-58." Moreover, Balogh received six separate "R's" or rejections, any one of which was sufficient to exclude him from the class of 64.[3] While neither Cisterino nor Jankowski received any "R's," their scores were still relatively low, "-62" and "-61," respectively.
 
 
 8
 Of the 64 finalists for the class, 46 (71.9%) were white males. There were also 4 (6.25%) blacks (two men and two women) and 16 (25%) women (14 white and 2 black). The two black males scored "-7" and "-8" on their background investigations. The two black females scored "-1" and "-16." The lowest score for a successful white male was "-8," and the lowest score for a successful white female was "-6."
 
 
 9
 Plaintiffs sought damages and injunctive relief under Title VII, 42 U.S.C. Sec. 2000e et seq., claiming that the Toledo Police Department, through the administration of its applicant testing procedures, had discriminated against them on the basis of their race and sex. In essence, appellants argued that they must have been discriminated against for being white males because they were not included in the class of 64 even though they had scored within the top 64 on the written exam. They claimed that the Department perpetuated the alleged acts of discrimination through the use of an allegedly subjective, non-reviewable background investigation scoring system.
 
 
 10
 Pursuant to Local Rule 7.09(4)(c) of the Northern District of Ohio, the cases were transferred to Judge Don Young on the basis that they involved issues arising out of a pending suit, Sarabia v. Duck (Sarabia v. Toledo Police Patrolman's Ass'n, supra ). The City moved for dismissal pursuant to Fed.R.Civ.P. 12(b)(6). Since both parties presented affidavits and other materials outside the pleadings, the district court treated defendant's motion as a motion for summary judgment under Fed.R.Civ.P. 12(b) and 56. The court granted defendant's motion and this appeal followed.
 
 II.
 A.
 
 11
 The City alleged that the plaintiffs' claims essentially constituted collateral attacks on the consent decree entered in Sarabia v. Duck and moved to transfer the case to Judge Young, the presiding judge in Sarabia v. Duck. The court granted defendant's motion pursuant to Local Rule 7.09(4)(c)(ii) which provides, in part, that:
 
 
 12
 (4) Cases related to cases already assigned to a judge shall be assigned or transferred to said judge. Related cases are defined as follows:
 
 
 13
 (C) Civil cases are deemed related when a filed case
 
 
 14
 * * *
 
 
 15
 * * *
 
 
 16
 (ii) involves the same issue or issues of fact or grows out of the same transaction or subject matter as a pending civil suit, or in suit in any pending case.
 
 
 17
 Plaintiffs contend that the court erred by transferring their cases because Sarabia v. Duck is not a pending suit and because their claims are unrelated to the case.
 
 
 18
 The Sarabia v. Duck consent decree specifically provides that the district court "shall retain jurisdiction over the matter for the entry of such further orders as may be appropriate to effectuate the provisions of this Order, and to monitor the progress of the Defendant in meeting its Affirmative Action obligations and its stated employment goal." The case remains on Judge Young's active docket. Therefore, plaintiffs' claim that Sarabia v. Duck, is not a "pending case" is without merit.
 
 
 19
 Plaintiffs' second claim, that the substantive merits of their cases are unrelated to the Sarabia v. Duck consent decree, is also without merit. The "[i]nterpretation of a consent decree is a matter of law reviewed de novo." Keith v. Volpe, 784 F.2d 1457, 1461 (9th Cir.1986). Moreover, "[i]n light of the district court's extensive experience with the case and the decree, we should give special deference to its conclusions about the meaning of the decree." Id.
 
 
 20
 We agree with the district court's conclusion that plaintiffs' general averments of reverse discrimination constitute an impermissible collateral attack upon the validity of the Sarabia v. Duck consent decree. The district court correctly reasoned that:
 
 
 21
 Plaintiffs have not alleged that the examination or negative system singled out the white male applicants for automatic rejection or that they were informed that they would not be selected because of their race or sex. Plaintiffs' case is based on the fact that black applicants were accepted for the recruiting class even though their scores on the written portion of the examination were lower than plaintiffs' scores.
 
 
 22
 District Court Opinion and Order at p. 5. Since the banding method adopted by the parties' 1985 modification to the Sarabia v. Duck decree makes it possible that applicants who perform well on the written examination will not be included in the list of successful candidates, plaintiffs' complaints generally implicate the validity of the decree itself, an issue already settled by the district court and this court. Sarabia v. Toledo Police Patrolman's Ass'n, 601 F.2d 914 (6th Cir.1979). If the district court awarded the plaintiffs equitable relief in the form of immediate admission to the police force, the decree's commitments to erasing "any vestiges of past employment discrimination within the [Toledo] municipal government" and to hiring officers based on validated testing would be compromised.
 
 
 23
 In sum, to the extent that plaintiffs' claims attempt to relitigate the merits of the Sarabia v. Duck decree, they constitute impermissible collateral attacks which deprive the district court of jurisdiction. "It is settled that a consent decree is not subject to collateral attack...." Dennison v. City of Los Angeles Dep't. of Water & Power, 658 F.2d 694 (9th Cir.1981) (citations omitted). Accord, Thaggard v. City of Jackson, 687 F.2d 66 (5th Cir.1982), cert. denied, sub nom. Ashley v. Jackson, 464 U.S. 900 (1983); Black & White Children of the Pontiac School System v. School District of the City of Pontiac, 464 F.2d 1030 (6th Cir.1972); O'Burn v. Shapp, 70 F.R.D. 549 (1976), aff'd without opinion, 546 F.2d 417 (3d Cir.1976), cert. denied, 430 U.S. 968 (1977).
 
 B.
 
 24
 Since the plaintiffs are precluded from collaterally attacking the validity of the Sarabia v. Duck consent decree, we must determine whether their claims that they received erroneous background scores because they are white males challenge the decree's validity or merely its implementation. The district court concluded:
 
 
 25
 Sarabia was a carefully negotiated and tailored order that was designed to prevent and remedy racial discrimination but yet would allow the defendants to retain the discretion to hire only those applicants who are qualified. The Sarabia decree does not concern itself with every aspect of the police division's exercise of discretion, including the determination of whether an applicant should be rejected on the basis of his misrepresentation of facts or criminal record. Therefore, plaintiffs' cause of action cannot be considered a per se collateral attack even though the granting of the request for relief would disrupt the hiring ratios of minorities mandated by the consent decree.
 
 
 26
 District Court Opinion and Order at p. 9. We agree with the district court's conclusion.
 
 
 27
 First, the district court has had considerable experience with the Sarabia v. Duck consent decree. Consequently, we do not hesitate to accord substantial deference to the district court's assessment of the breadth of that decree. See, e.g., Keith v. Volpe, 784 F.2d at 1461. Second, there is a distinction between a collateral attack upon the validity of a decree and a claim that a decree was erroneously implemented in a particular instance. To the extent that the plaintiffs' claims are premised upon the position that the purposes of the decree somehow violate federal law, then plaintiffs' claims must fail. However, to the extent that they are predicated upon an alleged misapplication of the Department's testing methods, plaintiffs' claims do not collaterally attack the decree's validity. Plaintiffs' claims that they were purposefully assessed erroneous scores on their background investigations because they were white males is an attack upon the Department's implementation of the Sarabia v. Duck decree and not the decree's validity. Consequently, as the district court concluded, plaintiffs' causes of action cannot be considered per se collateral attacks "even though the granting of the request for relief would disrupt the [minority] hiring ratios" mandated by the decree. A finding that the individual plaintiffs received mistaken scores because of their race and sex would, in the court's words, "only tangentially affect the implementation of the Sarabia decree."
 
 C.
 
 28
 Since we conclude that the district court had jurisdiction over plaintiffs' claims that they received erroneous background scores because of their race and sex, we must determine whether the district court properly granted the City's motion for summary judgment.
 
 
 29
 "A plaintiff in a Title VII action can prove liability under two theories: disparate treatment or disparate impact." Segar v. Smith, 738 F.2d 1249, 1265 (D.C.Cir.1984), cert. denied, sub nom. Meese v. Segar, 471 U.S. 1115 (1985). The district court held that plaintiffs had failed to state a claim under either theory.
 
 
 30
 In a disparate treatment case, it is the plaintiff's burden to prove that an employer intentionally "treats some people less favorably than others because of their race, color, religion, sex, or national origin." Id. (quoting International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977)). Proof of illicit motive is essential and may be inferred from a sufficient showing of disparity between members of the plaintiff class and comparably qualified members of the favored group. Id. at 1265-66 (citing International Brotherhood of Teamsters v. United States, 431 U.S. at 335 n. 15). To survive a motion for summary judgment, plaintiffs must show that the material facts underlying their claims are in dispute. "In ruling on a motion for summary judgment the trial court must view the evidence in the light most favorable to the party opposing the motion. On review, this Court must do the same." New Jersey Life Ins. Co. v. Getz, 622 F.2d 198, 200 (6th Cir.1980).
 
 
 31
 Plaintiffs do not dispute that defendant's system of investigating and verifying information on an applicant's background is racially or sexually neutral on its face. Nor have they made a principled argument that the system vests an inordinate amount of discretion in the system administrators.[4] In addition, plaintiffs have failed to show that the Department accepted any black or female applicants with negative background scores equal to or greater than plaintiffs'. Plaintiffs have also failed to show that any black or female applicants received fewer negative points than plaintiffs for comparable incidents appearing in their respective background investigations.
 
 
 32
 Plaintiffs' disparate impact theory is equally deficient for plaintiffs have failed to show any facts demonstrating that "the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pooled applicants."[5] Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).
 
 
 33
 The only remaining basis for plaintiffs' claims is that plaintiffs were simply assessed negative points for acts they did not commit. Even accepting plaintiffs' claims as true, there is virtually no evidence in the record to indicate that plaintiffs' erroneously low scores were motivated at all by any discriminatory animus. Whether plaintiffs lacked the opportunity to challenge or correct their scores is immaterial for Title VII purposes since plaintiffs have failed to show that blacks or females were given an opportunity to challenge or correct their scores.[6]
 
 III.
 
 34
 For the reasons set forth above, we AFFIRM the district court's order granting defendant's motion for summary judgment.
 
 
 
 [1]
 In 1974, the Toledo Police Department was sued by a female class which claimed that the Department's hiring and employment processes illegally discriminated against women. This court determined that the Department's policies had violated the fourteenth amendment, 42 U.S.C. Sec. 1983, and Title VII (42 U.S.C. Sec. 2000e et seq.). Harless v. Duck, 619 F.2d 611 (6th Cir.1980), cert. denied, 449 U.S. 872 (1980). The parties subsequently entered into a consent decree similar in purpose to the decree in Sarabia v. Toledo Police Patrolman's Association, supra
 
 
 [2]
 "The 'rule of three' ... requires that the civil service commission certify the names of the three candidates standing highest in the eligibility list for each position to be filled. The appointment must then be made from this group of three." Sarabia v. Toledo Police Patrolman's Ass'n, 601 F.2d at 915
 
 
 [3]
 The Department must give an applicant an "R" in lieu of negative points if the applicant committed any one of several listed incidents which the Department considers particularly serious. Apparently, no successful applicant to the 1985 class received any "R's". Three applicants who did receive "R's" and who ranked 7th (one "R"), 16th (2 "R's"), and 17th (2 "R's") were placed on "hold" pending further review
 
 
 [4]
 As the district court noted, "[t]he criteria employed allowed for only minimal personal discretion. For example, an applicant either was demoted during his former employment or he was not."
 
 
 [5]
 Prior to the entry of the 1985 applicant class, the Department's 701 officers were approximately 10% female and approximately 17% black. The percentage of blacks in the 1985 class was 6.5% and the percentage of females was 20%. Following the entry of the 1985 applicant class, the Department's female percentage rose a marginal amount to 11.68% and the percentage of blacks fell to 16.01%
 
 
 [6]
 The due process aspects of the City's non-reviewable background investigation process have not been challenged by plaintiffs