Barbara ZAMLEN, et al., Plaintiffs,

v.

CITY OF CLEVELAND, et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

CITY OF CLEVELAND, et al., Defendants.

Nos. C83–2484, C83–4998.

United States District Court,
N.D. Ohio, E.D.

May 27, 1988.

Jane M. Picker, Kathryn Olson, Kathryn M. Braeman, Edward G. Kramer, Roberta Reed, Vincent T. Lombardo, Marilyn Tobocman Sobol, Kenneth J. Kowalski, Kramer & Tobocman, Cleveland, Ohio, for plaintiffs in No. C83–2484.

Janet Burney, John D. Maddox, Director of Law, City of Cleveland, Cleveland, Ohio, for defendants.

Richard J. Giffels, Walter A. Rodgers, Beth Sebaugh, Quandt, Giffels, Buck & Rodgers, Cleveland, Ohio, for Dr. Norman Henderson.

Roger Colaizzi, William Bradford Reynolds, Richard S. Ugelow, Clifford Johnson, Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., for plaintiffs in No. C83–4998.

## MEMORANDUM OF OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

KRENZLER, District Judge.

This Memorandum of Opinion and Findings of Fact and Conclusions of Law will be written in several sections. First there will be a discussion in the form of a memorandum of opinion. Second, there will be findings of fact and conclusions of law. Finally, there will be general conclusions.

### I. *Procedural Background*

In Case No. C83–2484, the named plaintiffs, who brought the action on behalf of themselves and as class representatives, include Barbara Zamlen, Charlene Cuffari, Sharon Pirosko, Leana Adkins, Jennifer Garuccio, Concetta K. Zingale, Diane Horne, and Denise Campbell. The class includes all women who were unsuccessful applicants for entry-level firefighters in 1983 for the City of Cleveland ("City").

The original defendants included the City of Cleveland; George Voinovich, Mayor; Reginald M. Turner, Director, Department of Public Safety ("Safety Director Turn-er"); Thomas Skulina, President, Civil Service Commission; Edmund J. Turk, Vice–President, Civil Service Commission; Irene M. Morrow, Secretary, Civil Service Commission; Nancy Oliver, Civil Service Commission member; Solomon Harge, Civil Service Commission member; Karl Schneider, Personnel Administrator, Civil Service Commission; James McNamee, Fire Chief for the City ("Chief McNamee"); and Norman D. Henderson, Personnel Testing and Statistical Analysis ("Dr. Henderson"). All of the public officials were sued as individuals and in their official capacities.

The action was originally brought in four counts. Count One alleged that both the physical and written portions of the examination for entry-level firefighters in the City had an adverse impact on women applicants, was discriminatory, and violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"). Count Two alleged a violation of 42 U.S.C. § 1983 ("§ 1983") based upon violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. Count Three alleged a conspiracy among the defendants under 42 U.S.C. § 1985(3) ("§ 1985(3)") to deprive the plaintiffs of their rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. Count Four alleged that the defendants committed fraud by violating Ohio Rev.Code Ann. § 124.58, in that the defendants defeated, deceived or obstructed the plaintiffs' rights of examination, appointment or employment.

The plaintiffs are seeking injunctive relief as well as backpay, prejudgment and post-judgment interest, costs, attorneys' fees, and such other permanent relief as the Court deems just and proper.

The municipal defendants filed an answer which is in the form of a general denial of all of the principal allegations of the plaintiffs' complaint. In addition, the municipal defendants raised several affirmative defenses including that the selection device at issue is job related and predictive

of job performance. Dr. Henderson filed a separate answer in the form of a general denial of all of the principal allegations of the amended complaint. In addition, he asserted several affirmative defenses, the principal one being that the test that he designed and administered was job related.

In Case No. C83–4998, the United States of America ("United States"), the plaintiff, brought the action against the following named defendants: the City, Cleveland Civil Service Commission, Cleveland Fire Department, and in their official capacities, Turner, Director, Department of Public Safety; McNamee, Fire Chief, Cleveland Fire Department; Thomas Skulina, Edmund J. Turk, Irene M. Morrow, Nancy Oliver, Solomon Harge, members of the Cleveland Civil Service Commission.

This action was brought pursuant to § 707 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–6(a). The United States alleges that the defendants are responsible for establishing the terms, conditions, and other practices which bear upon the employment of firefighters in the City. The City employs approximately 961 individuals in sworn positions in the Cleveland Fire Department. At the time the complaint was filed not one of them was a woman. It is alleged by the United States that the defendants have pursued, and continue to pursue, policies or practices which discriminate against women and which deprive or tend to deprive women of employment opportunities because of their sex. It is alleged that the defendants have failed to adopt and use selection procedures for hiring which do not have an adverse impact on women and which are valid predictors of successful job performance or which are shown to be required by business necessity. The defendants' acts and practices constitute a pattern or practice of resistance to women's right to the full enjoyment of equal employment opportunities within the Cleveland Fire Department.

The United States is only seeking injunctive relief against the defendants to halt discrimination on the basis of sex in hiring, training and the assignment of female applicants or employees. The defendants filed an answer in the form of a general denial and raise the same affirmative defenses as in Case No. C83–2484. The two cases were consolidated for trial.

### CLASS CERTIFICATION

In Case No. C83–2484, the Court certified the class as all unsuccessful women applicants for the 1983 entry-level firefighters examination in the City and all future women applicants.

### DISMISSAL OF DR. NORMAN D. HENDERSON

The defendant Dr. Henderson was dismissed as a party defendant through settlement prior to trial.

### DISMISSAL OF OTHER DEFENDANTS

Prior to and during trial, all of the public officials were dismissed as defendants in the litigation.

### DISMISSAL OF COUNTS TWO, THREE AND FOUR OF CASE NO. C83–2484

At the end of the plaintiffs' case, the defendants moved for a directed verdict as to all four counts of the complaint. The Court granted the defendants' motion as to Count Two, the § 1983 case; Count Three, the conspiracy or § 1985 case, and Count Four, the pendent state claim for fraud. After dismissal of Counts Two, Three and Four and of the parties listed above, the trial continued as to Count One, the Title VII case against only the City.

## II. *Discussion*

This is a typical Title VII case with the usual three-part procedures for trial. The plaintiffs must first establish a *prima facie* case of sex discrimination. The defendants must then establish a business purpose or, in this case, the job relatedness of the test used to select firefighters. The plaintiffs must then proceed to establish that the job-related test is a pretext for discrimination. This is done by proving that there is another test that is equally job related, will have less adverse impact on women, is not discriminatory, and that will result in a strong probability that women applicants will be hired as entry-level firefighters. The purpose of this portion of

the trial is to show pretext and to negate the finding that the test given was nondiscriminatory.

There are many discrimination cases brought against governmental agencies by the United States or by minorities. Many of these cases are resolved by consent decrees which provide for set asides, which give a certain percentage of the jobs to minorities. When these cases are challenged they are usually upheld on the basis of a finding of past discrimination against the minority.

Further, many municipalities now have affirmative action plans which accomplish the same result as these consent decrees. When affirmative action plans are challenged, they also are usually upheld on the basis of past discrimination. The courts have held that municipalities can set aside or provide for a certain percentage or a number of entry-level positions and/or promotions for minorities.

In the present action, we are not dealing with black, white, or Hispanic male applicants for entry-level firefighters. Also, there is no consent decree or affirmative action plan which sets aside jobs for women. The question in the instant action is whether the theory of current preferential hiring to remedy past discrimination which applies to other minorities also applies to women.

There is no question that women have been discriminated against in many fields, intentionally or otherwise. There is no dispute that discrimination against women is unlawful. 42 U.S.C. §§ 2000e, *et seq.; Berkman v. City of New York,* 812 F.2d 52 (2d Cir.1987); *Brunet v. City of Columbus,* 642 F.Supp. 1214 (S.D.Ohio 1986), *appeal dismissed,* 826 F.2d 1062 (6th Cir. 1987). There can be no job discrimination on the basis of sex. The question is whether courts should recognize the fact of past discrimination against women and afford the same type of relief as that given to other minorities because of past discrimination.

In the case of blacks, the courts have made an accommodation because of past discrimination. However, current law does not provide that a certain percentage or number of jobs must be set aside for women because of past discrimination. Further, current law does not require that an affirmative action plan have a percentage or a stated number of women as entry-level firefighters. It is possible that this could be accomplished voluntarily by a consent decree or an affirmative action plan. No such voluntary resolution has occurred in this action. The current law, however, provides only that employers shall not discriminate against women, either in initial hiring or promotion.

Dr. Henderson was hired by the City to prepare entry-level firefighter examinations for 1977, 1980 and 1983. It is the written and physical components of the 1983 examination that are under attack in this action. Simply stated, the plaintiffs are alleging that both the physical and written portions of the examination have an adverse impact on women, are discriminatory, are not job related and, in the alternative, that there are tests that are equally job related that have a lesser adverse impact on women. The City contends that it is not liable because the written and physical components of the examination did not have an adverse impact on women, are job related and are nondiscriminatory.

The City has charter provisions and Civil Service regulations providing for the examination, testing, and hiring, by rank-order of City employees. These provisions provide for preference points which give veterans five points and residents of the City ten points on the Civil Service Examination. Cleveland, Ohio, Charter, ch. 27, § 74. The City also provides for rank-order, one-in-three hiring which means that for every opening three applicants will be considered by the hiring agency. Cleveland, Ohio, Charter, ch. 27, § 131. The procedure used by the City is to have tests, both written and physical, administered and graded. Successful applicants then are certified to the hiring agency.

For entry-level firefighters, the following is the procedure:

(1) written test;

(2) physical examination;

(3) psychological examination;

(4) medical examination; and

(5) background check.

In the present case, there was both a written and a physical examination, each with a maximum of fifty points or a total of 100 points on both components. Seventy percent is passing.

In this action we are dealing with firefighters. Firefighting is a highly skilled profession which requires strength, speed, endurance and a high degree of intellect. Because firefighting is concerned with matters of life and death and destruction of valuable property, it is a very important job. The standards normally applicable to the average job are not necessarily applicable to firefighting jobs.

■ The City, a charter city, has decided to use rank order for the hiring of firefighters. The City has decided that it wants the best possible firefighters. There is nothing improper with this, as long as the procedures used are not discriminatory against minorities and women. The City is not required to lower or reduce qualifications for entry-level firefighters for the purpose of accommodating minorities and women. The City can make a policy decision to hire the best qualified applicants and provide for rank-order hiring, but it cannot discriminate. The City could make a policy decision to hire generally qualified and adequate persons for the job, use a rank-order or pass/fail system with random selection and not discriminate. It is the City's choice. In other words, the City is free to choose any system of hiring as long as it does not discriminate against women and minorities.

■ Further, the City has elected not to have a formal affirmative action plan, as such. Nor is the City required to have an affirmative action plan. It is recognized that Title VII contemplates and encourages voluntary affirmative action plans, but there is no actual legal requirement that the City have an affirmative action plan that would mandate a certain minimum number of women firefighters.

There was testimony in this action that the City had some type of affirmative action plan to encourage women applicants to apply and be hired as firefighters. The City also provided for some training for women applicants over a twelve-week period. This Court does not find that the City has a typical affirmative action plan but only a quasi-policy to afford women applicants an equal opportunity to be hired. This was nothing more than a statement of the law regarding discrimination. This Court would not classify the recruitment and training program for women as a very concentrated effort to qualify women applicants for entry-level firefighters. The so-called affirmative action plan did not provide for a guarantee of the hiring of women firefighters.

Based on the testimony in this action, we are learning more about the strengths and weaknesses of women as firefighters. This is a new phenomenon and will have to be developed. There was testimony at the trial that it will be necessary to develop recruitment and training programs over a long period of time and have a very concentrated effort to increase the upper body strengths and other strengths of women to qualify as firefighters.

One of the principal complaints of the plaintiffs is that the physical test did not have an aerobic element. There was testimony that the principal portion of the physical examination tested upper body strength, speed, and anaerobic capacity with very little emphasis on aerobic capabilities. This Court finds that for the performance of firefighter's duties strength and speed are more important than aerobics. Aerobics can be tested by the Harvard Step Test, treadmill, bicycle, or other types of stress tests and can be a part of the medical examination, rather than the physical component of the examination.

If the City is serious about affording equal opportunity for women to become firefighters, it must do as Seattle, Washington, did and have a long-range, concentrated, strenuous training program for women applicants prior to examination. In this way their necessary skills can be devel-

oped and improved so that they can pass the entrance-level firefighting examinations.

The expert witnesses provided undisputed testimony that in a city such as Cleveland, Ohio, which uses rank-order hiring, has approximately 3,000 applicants for every test, and has the eligibility list expire every two years, it would be virtually impossible for women to be hired inasmuch as only approximately 40 firefighters are hired every year. The highest ranking woman applicant on the eligibility list in 1983 was No. 334.

The plaintiffs in the class action contend that the examination was discriminatory and resulted in an adverse impact against women applicants for the position of firefighters. Thus, the plaintiffs contend that the examination was invalid.

The contested aspects include the following:

(1) adding five preference points to veterans' scores;

(2) adding ten preference points to City residents' scores;

(3) adding one-and-three-quarter points to women's scores for the barbell physical portion of the examination;

(4) recognizing the *Headen* Decree, *Headen v. City of Cleveland*, Case No. C73–330 (N.D. Ohio April 25, 1975) ("*Headen* Decree"), and adding six points to minority applicants' scores on the written portion of the examination;

(5) failing to announce the exact physical examination events to be given;

(6) using a capping system;

(7) using an improper sequence of the physical events;

(8) using nonuniform rest periods between physical events;

(9) using a biased sampling in the validation system used by Dr. Henderson;

(10) using validation by Dr. Henderson which was done too late;

(11) constructing a rank order which was improper;

(12) failing to include an aerobic component in the physical portion of the examination.

(13) permitting late applications to be filed by some male applicants;

Each of the foregoing will be discussed.

## 1. VETERANS' PREFERENCE—5 POINTS

■ This applies equally to men and women and is not considered to be discriminatory against women.

## 2. RESIDENCY—10 POINTS

This applies equally to men and women and is not deemed to be discriminatory against women.

## 3. ADDING BARBELL POINTS FOR WOMEN—1¾ POINTS

■ Dr. Henderson added one-and-three-quarter points to women's scores for the barbell event because of their lack of familiarity with barbells. Adding these points was advantageous to women and, therefore, not discriminatory against women.

## 4. RECOGNITION OF THE HEADEN DECREE—6 POINTS

■ The *Headen* Decree was a valid decree of this Court which required the hiring of Black and Hispanic firefighters if they were qualified. There is no question that adding six points to the qualified Black and Hispanic applicants did have some adverse impact on the women. But the *Headen* Decree binds this Court. While the *Headen* Decree may have contributed somewhat to the disparate impact, it did not in any way affect the hiring of women firefighters who took the 1983 entry-level examination.

## 5. ANNOUNCEMENT OF EXACT PHYSICAL EXAMINATION

■ The City is not required to announce the exact physical tasks to be given on the examination. If the announcement of the written and physical components of the examination is fairly representative of the examination and puts applicants on suffi-

cient notice to prepare for the test, that is all that is required. It is not necessary for the City to give the exact written or physical examination in advance to applicants. All that the City is required to do is to announce, in a fair manner, the type of physical and written examination that will be given in order for the applicants to prepare for the examination. It is not necessary to give the exact events.

### 6. USE OF CAPPING SYSTEM

■ This is a method that limits or caps the maximum score that a person can receive on certain sections of the written examination. This permits an applicant to have some wrong answers and still get the maximum score in that section. This does not discriminate against women applicants.

### 7. SEQUENCE OF EVENTS

■ The plaintiffs complain about the sequence of physical events. No two fires are exactly alike and the sequence of events varies from fire to fire. It is not necessary for the City to announce in advance the sequence of physical events. The sequence was the same for male and female applicants. The sequence of events in the physical examination in 1983 was fair and reasonable and did not discriminate against women.

### 8. REST PERIODS BETWEEN PHYSICAL EVENTS

■ There were rest periods between physical events 1 and 2 and events 2 and 3. There were twelve to fifteen minutes between physical events 1 and 2 and eight to nine minutes between events 2 and 3. These rest periods were fair and reasonable and it was not necessary to have the same rest periods between the physical events. The rest periods did not discriminate against women.

### 9. BIASED SAMPLING IN VALIDATION PROCEDURES

■ When the City made its validation study for 1980, it sampled 277 firefighters. When it did the validation study for 1983, it sampled only 113 of those 277 firefighters.

The plaintiffs contend that this was a biased sampling. In making this concurrent validation, the City gave the 1983 physical and written examination to firefighters currently on the force and compared their scores with their academy training records and their job evaluations. While it would have been preferable to have the 1983 concurrent validation use all 277 firefighters, the fact that only 113 of the 277 were used did not result in discrimination against women. This was not a biased sampling.

### 10. TIMING OF VALIDATION STUDIES

The plaintiffs complain that the 1983 examination was flawed because the validation studies conducted by Dr. Henderson were not conducted in a timely fashion and were conducted merely for the purpose of preparing for the present litigation. There is no question that Dr. Henderson should have conducted his validation studies as soon as possible to make sure that the 1983 examination was job related. However, the question is whether the 1983 examination was or was not job related. It is the results of the validation that matters and not when the validation study is made.

### 11. RANK ORDER

The Charter of the City requires listing successful applicants in rank order. Cleveland, Ohio, Charter, ch. 27, § 131. For every opening or position to be filled, three names are given to the head of the department. The plaintiffs contend that the rank-order system is improper and that a pass/fail system with random hiring would be more appropriate and have less adverse impact on women and consequently no discrimination.

The City is free to choose either a pass/fail or a rank-order system. Under either method, the test must be job related and not discriminatory. The City, in its Charter, has chosen the rank-order system. It is not for the courts to determine whether the City should be required to have pass/fail or rank order. It is the court's function to decide if the City discriminated

in the preparation and administration of the test and the hiring of firefighters.

When a rank-order system is used, the City is required to demonstrate that by using this system, the higher score will result in a better firefighter. Based on the evidence in this action, including and the validation studies, this Court hereby approves the rank-order system and finds that it has not resulted in discrimination against women applicants for firefighters.

## 12. AEROBICS

Plaintiffs contend that the physical examination was discriminatory against women because it did not have an aerobic component but only had an anaerobic component. The statistics demonstrate, and the exercise physiologists testified, that men perform better than women in aerobic testing. In longer events, the difference between men and women is less but men still score substantially better than women in aerobic testing. There was no independent aerobic component in the physical examination. However, this lack of an aerobic component in the physical examination is not discriminatory. The aerobic component can be done as part of the medical component of the examination, after applicants pass the written and physical components of the examinations. While both aerobic and anaerobic components are important in firefighting, it is the anaerobic component that is more important because of the nature of firefighting. The initial period of the fire is critical. This is where the anaerobic component comes into play. Not having an independent aerobic component on the physical examination was not discriminatory against women.

## 13. CITY PERMITTING LATE APPLICATIONS

While the plaintiff introduced some evidence concerning this issue, it was so minor and insignificant that it does not warrant discussion and in no way affected the validity or job relatedness of the examination. It is at best a "throw in" argument of no significance.

There is no question that the statistics in this action demonstrate an adverse impact on women applicants. However, adverse impact by itself does not mean that there was discrimination against women applicants or that the test was not job related. Adverse impact results in discrimination when there is no justification for the adverse impact. If a test results in adverse impact but the test is job related, it will stand as valid unless the plaintiff can demonstrate that another test is equally job related and has lesser adverse impact. Then, the original test will be found discriminatory. The plaintiffs did not prove that the job-related test designed and administered by Dr. Henderson was a pretext and thus discriminatory, by showing that another test that was equally job related would have a lesser adverse impact to such an extent that Dr. Henderson's test would be considered discriminatory and invalid.

This Court finds that the plaintiffs proved their *prima facie* case that there was disparate impact. The Court finds that the City proved that the physical and written components of the examination were job related. The Court further finds that the plaintiffs failed to prove that there was an equally job-related, alternative test that would afford lesser adverse impact. Therefore, the plaintiffs failed to prove that Dr. Henderson's test was discriminatory.

## FINDINGS OF FACT

1. The selection of firefighters by the City is a multi-component process. First, candidates receive a score based upon performance on a professionally designed examination. Where applicable, veteran and/or residency preference points are added to the test scores. Candidates receiving 69.5 or more points are placed, in rank order, on an eligibility list.

2. After establishment of the eligibility list, further selection components include a medical test, a psychological test, and a background check. These three procedures are conducted only upon the highest ranking candidates. These procedures are performed only on a number of applicants

which coincide with a particular hiring demand.

3. Insufficiencies in any of the last three selection components result in the removal of the candidate's name from the eligibility list.

4. The general practice, based on the City's Charter is for the Director of Public Safety to hire in strict top/down rank numerical order from the eligibility list. Cleveland, Ohio, Charter, ch. 27, § 131. With respect to hiring firefighters, the only departure from strict top/down rank order hiring has been pursuant to the minority (Black/Hispanic) quota hiring system instituted by the *Headen* Decree, designed to remedy intentional and egregious racial discrimination.

5. To meet the requirements of the *Headen* Decree, the City's eligibility list was, in effect, divided into minority and non-minority lists, and appointments to the position of firefighter are made in rank-order from each eligibility list.

6. If selecting firefighters from the eligibility list by numerical order did not produce the necessary number of minorities to reach the 35% required by the *Headen* Decree, Safety Director Turner would instruct Chief McNamee that only minorities are to be considered.

7. The Cleveland Fire Department has several different types of companies based on the equipment used: (a) engine, (b) hook and ladder, and (c) rescue squads.

8. The City has twenty-eight pumpers, fourteen hook and ladder and three rescue squads.

9. In 1984, the authorized strength of the Cleveland Fire Department was 1,500 sworn officers.

10. According to the 1980 United States Census, the workforce in the Cleveland Standard Metropolitan Statistical Area is 46% female.

11. The necessary physical qualities of a firefighter include manipulative skills and sufficient strength and endurance to perform under fire conditions.

12. Non-physical qualities desired include initiative, courage, judgment, the abilities to learn and to cooperate.

13. The City stated in its Policy Statement of Affirmative Action and Equal Employment Opportunity in 1981 that the "administration is committed to the laws and ideals of Equal Employment Opportunity for minorities, women, and the handicapped." It stated further:

Specifically the City commits itself to the development and implementation of result-oriented goals, procedures and programs to reduce the under-utilization of minorities and women, and to achieve equity throughout the entire City's work force.

14. During meetings with Chief McNamee and members of his staff, Safety Director Turner found objections being made questioning the physical capacity of women to be firefighters to be invalid.

15. Safety Director Turner expressed his belief that it is an operational need for the City's Fire Department to have a personnel force reflective of Cleveland's population, male and female, because the community expects this kind of reflection—it provides awareness, a sensitivity to community problems and enhances the division's ability to function within the community.

16. Safety Director Turner did not recommend any new criteria for the employment of firefighters from those applied in prior years except for an effort to recruit minorities and women. Being satisfied with the applicants on the 1980 eligibility list, he had not suggested that either the written or physical components of the examination be made more difficult.

17. Prior to the hiring of the women as firefighters on April 22, 1985 pursuant to this Court's March 20, 1985, Order of Dissolving Preliminary Injunction Subject to Stipulated Conditions, no woman had ever been hired by the City as a firefighter.

18. Women firefighters observed by Assistant Fire Chief William E. Lee ("Chief Lee") performed very well on the job.

19. Women are firefighters presently in the cities of Columbus, Ohio; New York, New York; Seattle, Washington; and other major cities.

20. Pursuant to contract, Dr. Henderson provided examinations for entry-level firefighter selection for the City in 1977, 1980 and 1983.

21. The last three entry-level firefighter examinations given by the City were administered in 1977, 1980 and 1983. The three examinations differed somewhat in detail, but all tested similar cognitive and physical abilities.

22. A predictive criterion study was conducted correlating the performance of 277 firefighters selected from the 1980 examination with supervisory ratings obtained in 1985.

23. In 1980, twenty-eight females filed applications to take the examination.

24. In 1980, 911 applicants took both the written and physical components of the examination. Eight hundred ninety-two were identified as male and eighteen were identified as female. One applicant was unidentified by sex.

25. Of the eighteen persons identified as women who took the physical component portion of the 1980 examination, only one was placed on the eligibility list and was ranked 634, and thus, not high enough to be hired.

26. Three hundred fourteen people were hired from the 1980 eligibility list. Not one was female.

27. Of the male applicants who took both portions of the 1980 firefighter entry examination, 787 or 88.2% were placed on the eligibility list. Of the female applicants who took both portions of the 1980 firefighter entry examination, one or 5.6% was placed on the eligibility list.

28. In 1980, the rate at which women achieved a combined written and physical performance score high enough to be placed upon the eligibility list was 6.3% of the rate at which men achieved a combined written and physical performance high enough to be placed upon the eligibility list.

29. The average number of points received by persons identified as males on the physical performance portion of the 1980 entry-level firefighter examination was forty-one and the average number of points received by persons identified as females on the physical performance portion of the 1980 entry-level firefighter examination was 10.2.

30. The woman who received the highest score on the physical performance portion of the 1980 entry-level firefighter examination received 29.3 points.

31. Dr. Henderson has extensive experience in the area of job analysis and examination development for safety forces, including the position of entry-level firefighter. He has conducted over seventy job analyses and developed numerous tests, both entry level and promotional, for a variety of municipalities for the selection of safety forces.

32. The examination development process included interviews with hundreds of firefighters, the examination of fire training materials, the examination of written materials regarding operational procedures and the examination of equipment. Also used were consultations with high ranking officers, and the questionnaires to ascertain the frequency and importance of firefighting tasks.

33. Dr. Henderson's concern about gender differences and efforts to minimize adverse impact on females originated in the development of the 1977 examination and was a factor influencing development of the 1977, 1980 and 1983 examinations.

34. Building on his previous work, Dr. Henderson began a new job analysis in December of 1982. The purposes were to: (1) establish a list of tasks required of entry-level firefighters, (2) determine the frequency with which each task is performed and its importance to acceptable job performance, (3) group tasks into broad job dimensions, (4) assess the knowledge, skills and abilities required for learning and adequately performing critical and highly important job tasks, (5) determine overall knowledge, skills and abilities required for entry-level firefighters with respect to the

above tasks, (6) identify and define abilities and skills to be tested based on the above data.

35. An initial task list was compiled using data collected in 1974. By that time 271 Cleveland firefighters had rated 95 firefighting tasks in terms of the frequency performed and relative importance.

36. This original task list was reviewed in conjunction with the 1980 revision of the Ohio Trade and Industrial Education Fire Service Training Manual. Other sources examined were Cleveland written materials describing training and performance objectives. Task lists derived from other cities were also reviewed.

37. Revisions resulted in approximately 150 task statements.

38. The task statements were reviewed by Chief Lee, who was then Director of the Cleveland Fire Training Academy and a senior officer with over twenty-six years of firefighting experience. As a result of the review by Chief Lee and interviews with him, a final checklist of approximately 135 tasks was derived.

39. A total of thirty-five firefighters sampled from five fire stations were contacted individually to assist in the development of the job analyses. Firefighters were briefed on the purpose of the task analyses and then asked to review the task list questionnaire to clarify any misunderstanding as to how to complete the questionnaire using a computer-readable answer sheet. Each firefighter was to indicate the frequency with which he performed the job task listed. Firefighters were also asked to make note of any firefighting tasks which they thought had been omitted from the list.

40. Five senior officers in the Division were asked to rate each task listed on the questionnaire in terms of its relative importance. Each task was rated on a scale ranging from 1 (critical importance) to 4 (minor importance).

41. A list of equipment commonly used in firefighting was also compiled by Dr. Henderson and supplemented by using items found in various manuals. The list was reviewed by Chief Lee and other firefighters who were asked to add and delete items where appropriate. The equipment list was used in part to analyze knowledge skills and abilities involved in individual tasks.

42. Dr. Henderson, in conducting his job analyses, identified and evaluated twelve intellectual and perceptual abilities. They are described in the Technical Report.

43. Dr. Henderson's rating procedure for seventy-five job tasks was in accordance with professionally acceptable standards.

44. The written component of the 1983 examination measured intellectual and perceptual abilities in the approximate degree to which they are represented on the job.

45. Lieutenant John J. McManamon of the Cleveland Fire Department ("Lieutenant McManamon") designed and implemented a pre-examination recruitment and training program for women interested in becoming firefighters. He undertook this program under the direction of Chief McNamee, Chief Gerald Holman and Safety Director Turner.

46. Beginning in the fall of 1982, the City conducted an extensive recruitment campaign designed to advise females of the opportunities for employment as firefighters and to encourage qualified females to seek employment. The City also provided a free twelve-week pre-test training program for females covering both the cognitive and physical abilities necessary for firefighting. There was also a minority pre-test training program conducted by the City which was attended by both males and females.

47. Lieutenant McManamon sought and received funding from the Comprehensive Employment and Training Act (C.E.T.A.) program for the women's training program to pay for textbooks, equipment and instructors.

48. Classes in the women's training program began Monday, February 14, 1983, and continued for twelve weeks. Classes were held at the Fire Training Academy, as sanctioned by Safety Director Turner, Mon-

day through Thursday evenings from 6:30 p.m. to 10:30 p.m.

49. Due to his expertise, Chief Lee, Director of the Training Academy, was in charge of the classroom portion of the women's training program.

50. The 1982 edition of the "ARCO" Civil Service Test Tutor training manual ("ARCO book") was the textbook used for classroom instruction in the women's training program by instructors Chief Lee and John Lash.

51. Chief Lee encouraged the women to use the ARCO book and advised them that if they studied it well they should be successful on the written exam.

52. The training in the women's training program for the physical component of the 1983 entry-level firefighter examination was based primarily on the content of examinations given in prior years.

53. The physical portion of the women's training program contained evolutions in the following activities:

Dummy lift and carry (approximately 100 pounds);

Dummy drag (approximately 100 pounds);

Foam can carry (approximately 42½ pounds each—2 cans);

Hose drag (two sections of 125 feet weighing approximately 100 pounds);

Tower run (running up 6 stories carrying a 2¼ inch section of hose weighing approximately 50 pounds);

Tower run (carrying an air pack weighing approximately 49 pounds and a 1½ inch section of hose weighing approximately 35 pounds);

Six-foot fence climb;

Ladder lift (12–foot extension ladder lifted from a four-foot stage, raised over the head, placed on the floor and replaced in the original position);

Balance beam walk;

Hose coupling (connecting and disconnecting section of 2½ inch hose to fire hydrant).

54. Each session in the women's training program began with a 20–minute warm-up session and a one-mile run. Generally, the physical portion of the training session lasted 2½ hours and the non-physical portion 1½ hours. The physical portion of each session ended with a volleyball game which lasted from one-half to one hour.

55. Although the discussion between Dr. Henderson and Chief Lee concerning barbells occurred early in the development of the physical agility test, Chief Lee never recommended to any of the women training for the test that they work out with barbells.

56. One week before the actual physical component of the examination, applicants received a notice describing the events that would be on the actual examination. The events listed included a barbell event, in which applicants would be required to press a thirty-three-pound barbell thirty-five times.

57. The lifting of barbells was never required in previous Cleveland Firefighter entry-level examinations.

58. The training instructors obtained a set of barbells in order to provide some training to the women for this event. In the week immediately prior to the actual examination, the women trained for the first time for this event. The women who did such training improved somewhat, but it was the opinion of Lieutenant McManamon that with additional training the women could have become more proficient with the barbells.

59. In 1983, 485 persons enrolled in the Don McNea Police and Fire School in preparation for the 1983 firefighter entry-level examination. Of the top 100 persons on the eligibility list, forty-eight were McNea students; of the top 200, ninety-two or ninety-three were McNea students, and out of the top 300, 134 were McNea students. Six of the nine women who took the McNea classes were on the eligibility list.

60. Don McNea based his curriculum on prior examinations and from the study guide prepared by Dr. Norman Henderson. These materials indicated to him that me-

chanical reasoning and technical subjects would be covered on the written component of the examination, including material found in the Ohio Fire Training Manual.

61. Basing its curriculum for the physical component of the course on Henderson's earlier tests, the McNea School's training included a dummy drag, a hose drag (a 2½ inch hose), and a stair climb carrying a donut roll of hose. Weight lifting was recommended to develop biceps and forearms to enable candidates to carry the donut roll up 5 or 6 flights of stairs.

62. The Civil Service Announcement, issued January 3, 1983, informed candidates that the written portion would measure basic reading and math skills, the ability to follow directions, the ability to recall basic factual materials, and a variety of judgment and reasoning skills related to firefighting performance. Candidates were also informed that the physical agility portion would measure endurance, upper and lower body strength, and hand/eye coordination. The announcement advised that candidates be required to perform a series of events using actual firefighting equipment and that such equipment may have to be carried up and down stairs; that they have to drag hoses; and that they would perform a simulated rescue with a dummy of adult body weight. Candidates were informed that prior physical fitness training to increase physical endurance was recommended to maximize performance on the examination.

63. On April 30, 1983, the City administered the written portion of the examination. The physical portion was administered between May 7 and May 13, 1983.

64. 3,612 persons applied to take the 1983 entry-level firefighter examination. 2,212 took the written test and 1,223 took the physical examination.

65. A composite score of 100 points was the maximum achievable score, with fifty points achievable for each portion.

66. In addition to the composite examination score, each candidate who was a qualifying veteran received five points pursuant to the City charter. Cleveland, Ohio, Charter, ch. 27, § 74.

67. Each candidate who was a Cleveland resident at the time of application and who received a score of 69.5 or greater (composite test score plus veterans' points, if applicable) received 10 points pursuant to the City charter. *Id.* Most candidates received residency points and nearly every candidate who was hired in 1983 and 1985 received residency points.

68. Pursuant to instructions from the Civil Service Commission, the 1983 entry-level firefighter examination required that applicants complete the written portion of the examination successfully before taking the physical performance test.

69. The job of firefighter in the City of Cleveland requires certain cognitive abilities including reading comprehension, numerical skills, and various forms of reasoning.

70. The written examination included 120 questions divided into six sections. Dr. Henderson pre-tested all reading and math materials on four women and one man, each of whom was either a student or a relative of Dr. Henderson. Some of these same individuals also assisted in the development of test questions.

71. The first section of the written examination consisted of twenty questions which were based on study materials distributed at the beginning of the examination. The second section consisted of twenty-eight questions designed to test reading comprehension. The third section consisted of fifteen questions designed to test the candidates' ability to follow directions. The fourth section consisted of twenty-five mathematical questions, one of which was not graded. The fifth section consisted of eighteen questions designed to test judgment. The sixth section consisted of fourteen questions designed to test reasoning ability.

72. Although each question answered correctly on the written examination gave the candidate a half point, the scoring of the written examination involved the setting of a cap on maximum scores within each section of the examination. The cap-

ping of scores was used in the scoring of examination answer sheets of all candidates taking the written examination.

73. The examination answer sheets of candidates of certain minority groups were graded differently from those of other candidates, pursuant to the *Headen* Decree.

74. Candidates who had indicated on Civil Service Commission racial information forms, completed at the time they applied to take the 1983 entry level firefighter examination, that they were Black or of Hispanic background received certain additional points on the written examination, pursuant to the *Headen* Decree.

75. The passing score on the written examination was 35.00 for whites and 29.00 for minorities. These cutoffs were not based on possible job performance but only on whether the applicant could reasonably be expected to rank high enough on the eligibility list to be considered for hiring.

76. Points were awarded to qualified veterans prior to their taking the written examination. Five points were added to the scores of veterans without regard to whether they received a passing score of 35.00 on their written examinations.

77. 285 women took the written portion of the 1983 entry-level firefighter examination and 122 women successfully completed it. 1,927 males took the written portion of the examination and 1,206 successfully completed it. Twenty-nine females were placed on the eligibility list but none ranked high enough to be hired during the two-year period within which the eligibility list is used.

78. The City was required by Court Order of January 17, 1977, to follow the *Uniform Guidelines on Employee Selection,* 29 C.F.R. §§ 1607, *et seq.* ("Uniform Guidelines"), with respect to future hirings for firefighters. *Headen v. City of Cleveland,* C733–330, slip opinion at 5. Dr. Henderson was also required by the City's RFP for the 1983 examination to follow the Uniform Guidelines.

79. Up to six points were added to the written score of male and female minority candidates who had not already earned full credit within the ceiling approach used for scoring. This was done in an effort to ensure that a sufficient number of minorities were available to take the physical portion of the examination in an attempt to comply with the minority preference provisions of the *Headen* Decree.

80. Hiring is done within race pursuant to the *Headen* Decree, thereby adding points to the written scores of male and female minority candidates and thus did not affect the validity of the 1983 examination.

81. The scoring of the written portion of the 1983 examination was as follows:

| Section | Items | Ceiling | Maximum Points |
|---|---|---|---|
| 1 Study Material | 20 | 18 | 9.0 |
| 2 Reading Comprehension | 28 | 23 | 11.5 |
| 3 Following Directions | 15 | 15 | 7.5 |
| 4 Numerical Skills | 25 | 20 | 10.0 |
| 5 Conclusions & Judgment | 18 | 13 | 6.5 |
| 6 Reasoning | 14 | 11 | 5.5 |
| Total | 120 | 100 | 50 |

82. The physical component of the 1983 examination consisted of three events. In Event 1, using a barbell containing thirty-three pound weights, candidates were required to repeatedly lift the barbell overhead for one minute or until they reached the maximum of thirty-five lifts. In Event 2, while wearing a standard self-contained breathing apparatus tank, which had been individually fitted by fire personnel, a candidate was required to drag two lengths of standard 2½ inch hose a total of 180 feet (ninety feet in one direction, drop coupling, run to the other end of the hose, pick up and return ninety feet dropping the coupling in a designated area), run approximately seventy feet to a pumper, remove a one-person ladder (twelve feet and approximately thirty-five pounds) from the side of the pumper, carry the ladder into the fire tower, place the ladder against the back wall of the first landing which was marked with a sign, and continue up the inside stairwell to the fifth floor where a monitor observed that the candidate reached this point. The applicant then returned to the first landing, retrieved the ladder and placed it on the pumper. A candidate's score was based on the time required to

complete the entire event. All candidates were given verbal instructions concerning the procedures to be followed, including the proper way to direct the hose over their shoulder to maximize their pulling capacity. In Event 3, applicants, also wearing the self-contained breathing apparatus tank, were required to drag a bag weighing 100 pounds seventy feet, including forty feet of low headroom area (thirty-eight inches high), turn and return to the starting point. The time to complete this event was used as a basis for establishing performance score.

83. The Training Academy provided instruction with respect to subjects on which the applicants were examined in the written component of the 1983 entry-level firefighter test. Training in the Academy was based on the Ohio Fire Service Training Manual. This book was distributed to all cadets and the Academy has been using it since 1972.

84. Instructors at the Training Academy instruct the cadets, in using a pike pole, to bend their knees. The barbell lift was meant to simulate the use of pike poles in tearing ceilings. Directions for this physical event required candidates to perform the lifts with their legs straight.

85. The probability that only one woman would achieve a score high enough to be placed on the eligibility list to be unrelated to sex is one in 5,000.

86. The scoring of the physical portion of the 1983 examination was as follows:
Event 1 (Barbell Lift)
Ceiling—35 lifts
Score = (10 × no. of lifts)/35
Maximum points—10
Event 2 (Hose Drag and Tower Climb)
Ceiling—95 seconds
Score =     (195 sec. — applicant's time)/4
            More than 175 sec. but less
            than 5 min. = 5 pts.
            More than 5 min. = 0 pts.
Maximum points—25
Event 3 (Dummy Drag)
Ceiling—30 seconds
Score =     (90 sec. — applicant's time)/4
            More than 76 sec. but less
            than 5 min. = 4 pts.
            More than 5 min. = 0 pts.
Maximum points—15

87. Up to 1.75 points were added to the physical agility scores of females who had not already earned the full credit on the barbell event (Event No. 1) to adjust for lack of familiarity with barbells. The effect was to reduce male/female differences on the barbell event to less than one (1) point.

88. The most critical aspects of firefighting occur during the initial few minutes after arrival at the fire and whenever rescue is being performed. The physical abilities necessary for successful performance of the most critical aspects of firefighting include strength, both upper body and lower body, and speed. Strength is important for the successful performance of many firefighting tasks.

89. One critical aspect of firefighting is the provision of a continuous supply of water.

90. This activity is generally performed in a non-highrise structural fire by having a single firefighter drag a supply hose from a pumper a distance which may exceed 180 feet and coupling the hose to the hydrant within a short enough time that the pump operator can begin supplying water to the attack lines before the on-board water in the pumper is exhausted.

91. Firefighting is a very labor intensive job.

92. It is common for firefighters to take ladders off a pumper and carry them up steps.

93. It is common for firefighters to have to climb several flights of stairs wearing air tanks. This must be done with speed particularly in the contexts of a rescue or when locating and accessing a water supply (stand pipe) in a high rise structure.

94. Numerous critical and important firefighting tasks require significant levels of upper body strength including, among others, operating the jaws-of-life, operating a K–12 saw (a power saw with a very high torque), removing ladders from apparatus, raising ladders, using a pike pole to tear ceilings, chasing fire or looking for hidden fire, operation of an ax to chop roofs for ventilation or to open walls to chase fire or

look for hidden fire, carrying a multitude of heavy equipment, hanging ventilation fans, carrying ladders, using ladders as a tool to break second-story windows for ventilation, using axes or other tools to break windows for ventilation while keeping a leg lock on a ladder.

95. Many firefighting tasks involve substantial upper body strength, involving lifting and/or working overhead with heavy objects.

96. The greater the aerobic capacity of a firefighter, the longer the firefighter will be able to sustain activity without rest.

97. It is the City's practice to dispatch a sufficient number of firefighters so that fresh firefighters can replace those who are exhausted, providing a period of rest and recovery.

98. The physical agility portion of the 1983 test was a reasonable measure of the physical abilities necessary for successful performance of firefighting, particularly its most critical aspects.

99. Event No. 1 tests the elbow extenders and shoulder flexors and the requisite strength to lift and/or work with heavy objects overhead. Lifting and working with heavy objects overhead is an important job behavior.

100. The prohibition against bending knees during the performance of Event No. 1 was necessary in order to isolate for testing the muscle groups involved in lifting overhead.

101. Event No. 2 is principally a power event involving leg power and back strength. Tasks performed in Event No. 2 are representative of critical firefighting tasks frequently performed in situations where speed is the principal concern.

102. Event No. 3 assesses the strength and power and muscles required to perform dragging type action including, amongst others, rescue. The event simulates the critical firefighting task of rescuing a disabled adult when smoke and/or heat necessitate the use of low drag.

103. There are significant gender differences with respect to physical abilities. Males greatly exceed females in upper body strength, leg strength, and aerobic capacity.

104. In terms of upper body strength, the difference between males and females is approximately two to one. In terms of lower body strength, females have approximately 75% of the lower body strength of males. In terms of overlap, generally only the top 15% of the females overlap the bottom 15% of males in terms of upper body strength. With respect to lower body strength, that is leg strength, there is a 35% overlap between upper females and lower males. The upper 25% of females overlap the lower 25% of males in terms of relative aerobic capacity.

105. Another critical aspect of firefighting is ventilation. One common form of ventilation requires chopping holes in the roof of a structure.

106. Roof chopping requires removing and raising of a wall ladder against the structure, carrying and eventual pushing up of a roof ladder onto the roof, ascending the roof by climbing the roof ladder while carrying axes, and chopping holes in the roof with axes, frequently while straddling the peak of the roof.

107. The entire process of ventilating a roof must be accomplished within approximately five minutes.

108. Failure to quickly perform activities, such as providing a continuous supply of water and ventilation, increases the risk of injury to firefighters, delays extinguishment efforts, increases fire spread, and delays victim rescue efforts.

109. Another critical aspect of firefighting is the rescue of unconscious or otherwise disabled victims. It is common for a single firefighter to conduct the rescue of an adult victim. It is very common for the firefighter to drag the victim while assuming a low crawl position. Strength and speed are essential to successful performance of this activity.

110. There is no typical fire or typical series of activities performed during firefighting.

111. A job-related test for firefighting does not require that representative tasks be performed in any particular sequence.

112. The validation studies prepared by Dr. Henderson, including his ratings on the relationship between the abilities identified as necessary for the job and the task and the relationship between the abilities identified and the test were not prepared prior to or at the time of the development of the test. Instead, they were only prepared after the start of this litigation. The technical studies underlying Dr. Henderson's attempts at validating both the written and physical components of the examination were completed sometime in 1986, long after the examination was administered and graded.

113. The ratings relating the abilities identified as necessary for firefighting to both the specific tasks of the job and the test, which is an important part of the job analysis, are studies that should be prepared as a test is being developed in order to insure that the test is job related.

114. The maximum attainable score for candidates on the physical portion of the 1983 entry-level firefighter examination was 50.00. 35.00 was considered a passing score. Of the 1,125 men taking the physical test, 1,002 passed. Of the 101 women taking the physical test, 15 passed.

115. Dr. Henderson included the barbell lift to measure absolute muscular endurance of shoulder and upper limbs.

116. This event did not allow use of the lower body, as applicants had to lock their legs.

117. Event No. 3, the dummy drag, was designed to be a content valid item by demonstrating the drag rescue of a victim from a smoke-filled room.

118. The Court finds that the 1983 physical performance examination puts a premium on speed and is primarily a test of anaerobic, rather than aerobic, capacity.

119. The Court finds that the 1983 physical performance examination is content valid.

120. A concurrent criterion study was conducted of the 1983 examination using a pool of 113 firefighters hired from the 1980 examination.

121. A sub-sample of 61 firefighters was also given the Harvard step test. The Harvard step test is a measure of sub-maximal aerobic capacity and is commonly used in screening and for research. The results of the Harvard step test were then correlated with scores on the physical ability component of the examination. Results revealed a within race correlation between the Harvard step test and the physical ability component of .39. When this correlation was corrected for range restriction, that is, comparing it to the applicant pool and reliability of the step-up test, the estimated true correlation between the fitness scores on the Harvard step-up test and the physical ability scores was .55, with a standard error of .09. This indicated that the 1983 examination reflected a relatively high degree of general cardio-vascular fitness.

122. The correlation between the 1983 entry-level examination scores and job ratings in terms of overall performance criteria was as follows: For average job rating, correlation for the total test was .42; for percentile ranking, correlation was .45; for career rescue estimates, the correlation was .45; for dollar value of work, the correlation was .46; and for productivity, the correlation was .42. All these correlations are highly statistically significant and are well beyond the demands of the Uniform Guidelines.

123. Correlation coefficients of .3 or greater are considered high by industrial psychologists.

124. The concurrent validation study of the 1983 examination revealed that firefighters scoring highest on the 1983 examination also had the highest job ratings. Those scoring an average of ninety-one points on the 1983 examination had higher job ratings than those scoring average points of eighty-two and further higher job ratings than those with average points of sixty-nine.

125. The 1983 entry-level firefighter examinations predicted job performance.

126. The addition of a direct assessment of aerobic fitness to the city's selection process would not result in less adverse impact upon the selection rate of females.

127. The alternative scoring mechanisms advanced by plaintiffs would not result in less adverse impact upon the selection rate of females.

128. Speed and strength, not aerobic capacity, are the distinguishing physical abilities necessary for successful firefighting during the first moments of arrival at a fire scene when matters of life and death and the extent of property damage are critical.

129. The content of the 1983 entrance examinations is representative of important aspects of performance of the job of firefighting.

130. The 1983 examination measures the degree to which candidates have characteristics which are important for successful job performance.

131. There is a statistically significant relationship between scores on the 1983 examination and job performance.

132. For the same reason, the plaintiffs challenge to the criterion study for the 1983 examination is unpersuasive. Additionally, plaintiffs have failed to establish that the sample of 113 firefighters used in the study was nonrepresentative of the full population of over 900 Cleveland firefighters.

133. The policy of the City respecting the selection of firefighters is that the testing procedures identify those candidates best able to protect the health, safety and welfare of the citizens of Cleveland and that it is fair without arbitrarily excluding women from selection.

134. Dr. Henderson's arbitrarily adding points to scores based on race and sex without a mandate from the City of Cleveland or the courts is not in accord with professionally accepted standards.

135. An eligibility list was certified by the Civil Service Commission on May 19, 1983 and included the names of 1,098 successful candidates.

136. The eligibility list established after administration of the 1983 entry-level firefighter examination included the names of 1,069 men and 29 women. The woman with the highest score, Frances Hansen, was number 334 on the list of eligibles.

137. Because of their scores on the entry-level firefighter examinations, no women were hired by the Fire Department in 1983.

138. Notwithstanding his or her position on the eligibility list, each individual who appears on the eligibility list possesses the necessary cognitive and physical abilities to be a Cleveland firefighter.

139. The 1983 entry-level firefighter examination has been demonstrated to be valid using a criterion related strategy.

140. The 1983 entry-level firefighter examination has been validated using a construct validity strategy.

141. Women were not treated adversely in terms of the opportunity to apply and take the 1983 entry-level firefighter examination.

142. The 1980 entry-level firefighter examination had an adverse impact upon the employment opportunities for women.

143. On April 22, 1985, the City hired seventy-five firefighters, sixty-five of whom were males and ten were females. But for this Court's Order dated March 20, 1985, no females would have been hired.

144. The lowest non-minority male hired on April 22, 1985 was ranked number 107. The lowest minority male was ranked number 215.

145. Females hired in 1985 pursuant to this Court's order were ranked numbers 334, 631, 837, 940, 950, 952, 987, 1,039, 1,099 and 1,097 on the eligibility list.

146. Candidates possessing higher levels of cognitive skills, strength and speed are likely to better perform the job of firefighting.

147. Higher scores on the examination are likely to result in better performance of the job of firefighting.

148. Firefighters scoring higher on the examination are likely to be more productive than firefighters scoring lower.

149. A validation study was conducted of the 1980 examination. Supervisor ratings for 277 firefighters were compared with scores of those same firefighters on the 1980 examination. The results showed that those firefighters who scored highest on the examination received higher supervisor performance ratings.

150. Based on any of the three accepted statistical measurements to determine disparate impact, binomial probabilities, chi square analyses or the fourth/fifth's rule, the 1983 entry-level firefighter written test had a disparate impact on women applicants.

151. The percentage of males passing the written examination was 62.5%. The percentage of females passing the written examination was 42.8%. A comparison of the two percentages indicates that the pass rate for females was only 50.64% of the pass rate for males. This pass rate satisfies the Uniform Guidelines' definition of adverse impact.

152. Of the 1,328 people passing the written examination, 122 were female. Given the representation of women in the applicant pool—12.8%—the probability of having that few women pass the examination is significantly lower than by chance.

153. In 1983, 1,223 applicants took the physical performance examination, of whom 1,122 or 91.7% were male and 101 or 8.3% were female.

154. 1,069 or 89.3% of the males achieved a combined score on the written and physical performance examinations high enough to be included on the 1983 eligibility list. Twenty-nine or 28.7% of the females achieved a combined score high enough to be included on the 1983 eligibility list.

155. 1,002 or 89.3% of the males received a score of thirty-five or higher on the 1983 physical performance examination. Fifteen or 14.9% of the females received a score of thirty-five or higher on the 1983 physical performance examination.

156. The rate at which women received a combined written and physical score high enough to be placed upon the eligibility list was 30.2% of the rate at which men received a combined written and physical score high enough to be placed upon the eligibility list.

157. The rate of women scoring thirty-five or higher on the 1983 physical examination was 16.7% of the rate for men.

158. The physical performance component of the examination administered in 1983 had an adverse impact upon women.

159. In May of 1983, the City adopted an eligibility list.

160. Alternative scoring schemes provided by the plaintiffs demonstrate that the removal of minority points would not have resulted in the selection of any female within her race classification.

161. The eligibility list would have expired on May 19, 1985. However, pursuant to Order of this Court dated March 20, 1985, the list was extended until July 31, 1987.

162. On July 18, 1983, Cleveland hired thirty-five firefighters.

163. The highest female on the 1983 eligibility list is ranked number 334 and is a non-minority. The highest minority female is ranked number 778.

164. The probability that only one woman would achieve a score high enough to be placed on the eligibility list to be unrealted to sex is one in 5,000.

CONCLUSIONS OF LAW

1. Title VII is concerned with discrimination in hiring and promotion, not merely discrimination in testing and test results. There must be a direct relationship between testing and test results and hiring and promotion. Tests that are designed whereby women applicants score lower than men, resulting in women being denied the opportunity and right to be hired, produce a disparate impact and are thus discriminatory. The adverse impact or discriminatory effect relates to a denial of job

opportunities to women. The concern is discriminatory effect. It is not merely that women do not test as well as men that is important. Before the disparate impact can be considered discriminatory the differential in test scores must result in women being denied the opportunity to be hired in a pattern significantly the same as the pool of applicants.

■ 2. To establish a *prima facie* case of a pattern or practice of discrimination under § 2000e–6, the plaintiff must show by a preponderance of the evidence that the discrimination was the defendant's "standard operating procedure"; that is, the "regular rather than the unusual practice." *Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed. 2d 396 (1977). The evidence must show, or allow the court to draw an inference of, the employer's intent to discriminate against a particular group protected by Title VII.

3. Once a *prima facie* case of pattern or practice discrimination is established by the plaintiff, the burden then shifts to the defendant to show either that the plaintiff's statistical evidence is inaccurate or misleading or that there was a legitimate nondiscriminatory reason for the disparity. *Hazelwood School District v. United States,* 433 U.S. 299, 305 n. 9, 97 S.Ct. 2736, 2740, 53 L.Ed.2d 768 (1977).

4. After a *prima facie* case has been established, it becomes incumbent upon the defendant to show that its employment practice, which results in the statistical disparity, is a result of some bona fide occupational qualification which is reasonably necessary to the safe operation of the business. *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726–2727, 53 L.Ed. 2d 786 (1977).

■ 5. If a plaintiff in a Title VII case proves a *prima facie* case of disparate impact, the employment practice is presumed discriminatory unless the defendant justifies its conduct. Adverse impact means that there is a substantially different rate of selection, hiring, promotion or other employment decisions which works to the disadvantage of members of a race, sex, or ethnic group. Disparate impact means that the impact of the test is unequal. Disparate impact means, for purposes of an employment discrimination suit, those employment practices which are neutral on their face but result in a comparatively harsh impact on one group, not justified by business necessity. In such a case, proof of discriminatory motive is not required and the plaintiff must show only that facially neutral standards select applicants in a significantly discriminatory pattern. *Id.* In other words, the plaintiff must show that the defendant's employment practices, although facially neutral in their treatment of different groups, in fact, fall more harshly on one group than another and cannot be justified by business necessity.

Discrimination means unfair treatment or denial of normal privileges to persons because of their race, age, nationality, or religion. In other words, discrimination is a failure to treat all persons equally where no reasonable distinction can be found between those favored and those not favored.

■ 6. The differential selection rate of males versus females for the job of firefighter in the City constitutes adverse impact.

7. "Two theories are available to a plaintiff under current law to prove a case of unlawful discrimination [under Title VII of the 1964 Civil Rights Act]: disparate treatment and disparate impact." *Rowe v. Cleveland Pneumatic Co. v. Numerical Control,* 690 F.2d 88, 92 (6th Cir.1982).

■ 8. An employer violates Title VII if it bases its selection decisions on procedures which have an adverse impact on women in opportunities to be selected, unless the employer can show that the use of the procedures validly predicts successful job performance. *Connecticut v. Teal,* 457 U.S. 440, 451, 102 S.Ct. 2525, 2532–2533, 73 L.Ed.2d 130 (1982); *Dothard,* 433 U.S. at 329, 97 S.Ct. at 2726–2727; *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971); *Harless v. Duck,* 619 F.2d 611, 616

n. 6 (6th Cir.1980); *Guardians Association v. Civil Service Commission,* 630 F.2d 79, 88 (2d Cir.1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1980); *Brunet v. City of Columbus,* 642 F.Supp. 1214, 1245 (S.D. Ohio 1986), *appeal dismissed,* 826 F.2d 1062 (6th Cir.1987).

9. Proof of disparate impact requires the plaintiff to prove the disparate impact of the selection device, after which the burden of proof shifts to the defendant to demonstrate that the selection device is required by business necessity. In the event that the defendant succeeds in meeting its burden, the burden of proof then returns to the plaintiff to demonstrate pretext. This is done by demonstrating that a less restrictive alternative test exists, and that the defendant was using the original test as a pretext for discrimination. *Teal,* 457 U.S. at 446–47, 102 S.Ct. at 2530; *Dothard,* 433 U.S. at 312, 329, 97 S.Ct. at 2726–2727; *Albermarle,* 422 U.S. at 425, 95 S.Ct. at 2375; *Harless,* 619 F.2d at 616 n. 6; *Brunet,* 642 F.Supp. at 1245.

10. Once it has been shown that a test or other selection procedure has a discriminatory impact on the selection of women, the defendant has the burden of showing that the selection procedure was a business necessity and has been validated in accordance with accepted standards of the psychological profession. *Albermarle,* 422 U.S. at 431, 95 S.Ct. at 2378; *Harless,* 619 F.2d at 616, n. 6; *Brunet,* 642 F.Supp. at 1221, 1230.

11. Only after the defendant proves that the test was validated, is job related, and is not discriminatory are the plaintiffs put to their burden of rebuttal.

In the rebuttal stage, the plaintiffs must prove pretext. First, the plaintiffs must prove that the test is in fact not job related and thus discriminatory. Second, the plaintiffs may show that there is an alternative test that is equally job related and result in less adverse impact on women applicants than the test at issue. In cases where some women or other minorities are being hired, the alternative job related test should result in more women or minorities being hired. Under these circumstances,

courts would then hold that the plaintiff has shown pretext and that, while the test at issue may still be job related, it is discriminatory and thus invalid.

Because no women have placed high enough on the eligibility list to be hired, the plaintiffs, in the present action, must show more in their rebuttal case than if any women had been hired. Based on the evidence adduced at trial, women applicants rank so low that none ranked high enough on the eligibility list to be hired.

It is not sufficient for the plaintiffs, on rebuttal, to show only that the alternative test was job related and that women would do proportionately better on the alternative test than they did on the defendants' test. Rather, the plaintiffs must prove that the alternative test is job related and would result in a strong likelihood and probability that women applicants would rank high enough on the eligibility list to be considered for hiring. The mere fact that a job-related alternative test would only provide a lesser adverse impact on test scores is not a sufficient basis on which to nullify or declare invalid the defendants' test.

In the present case, the plaintiffs did not demonstrate that there was an alternative test that was as equally job related as the defendants' test and that would produce a lesser adverse impact on the hiring of women than the defendants' test. Further, the plaintiffs did not prove that an alternative job related test would increase the women's examination scores or would result in a strong probability or likelihood that women would place high enough on the eligibility list to be in a position to be hired.

12. The Supreme Court, the Uniform Guidelines, and the standards of the psychological profession, American Psychological Association, *Standard for Educational and Psychological Testing* (1985) ("APA Standards"), recognize three validation strategies: criterion-related validity, content validity, and construct validity. *Uniform Guidelines,* 29 C.F.R. § 1607.5; *APA Standards,* p. 9; *Washington v. Davis,* 426 U.S. 229, 247 n. 13, 96 S.Ct. 2040, 2051, n. 13, 48 L.Ed.2d 597 (1976); *Harless,* 619

F.2d at 616, n. 5; *Brunet*, 642 F.Supp. at 1242; *Principles for the Validation and Use of Personnel Selection Procedures, Division 14* of the American Psychological Association, p. 6 (September 8, 1986) ("Division 14 Principles").

▮ 13. Content validity is appropriate where the content of the test "closely approximates tasks to be performed on the job." *Washington*, 426 U.S. at 247, n. 13, 96 S.Ct. at 2051, n. 13; *United States v. City of Chicago*, 573 F.2d 416, 425 (7th Cir.1978); *Brunet*, 642 F.Supp. at 1242. If the validity of a test which measures knowledge, skills or abilities is supported on the grounds of content validity the test must measure operationally defined knowledge, skills, or abilities that are prerequisites to successful job performance for critical tasks necessary to perform the job successfully. *Uniform Guidelines*, 29 C.F.R. § 1607.14. Content validity is not an appropriate strategy for a selection procedure involving knowledge, skills or abilities which the employee will be expected to learn on the job.

14. Criterion-related validity requires empirical data demonstrating that the selection procedure is predictive of, or significantly correlated with, a criterion which represents an important work behavior, and that the correlations are practically significant. *Ensley Branch of N.A.A.C.P. v. Seibels*, 616 F.2d 812, 816, n. 11 (5th Cir.1980), *cert. denied*, 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980).

15. Construct validity requires the demonstration of a "relationship between underlying traits or 'hypothetical constructs' inferred from behavior and a set of test measures related to those constructs." *Uniform Guidelines*, 29 C.F.R. §§ 1607.-14(D), 1607.15(D).

16. The job of firefighter requires a high degree of skill and physical ability. The public interest clearly lies in having the most highly qualified person selected for the position of firefighter.

17. The risks to the public in terms of life, limb and property as a consequence of hiring an unqualified firefighter are great, resulting in a less heavy burden for demonstrating the job relatedness of the employment criteria. *Spurlock v. United States Airline, Inc.*, 475 F.2d 216, 219 (10th Cir. 1972); *Davis v. City of Dallas*, 777 F.2d 205, 211–13.

18. To justify hiring requirements as a business necessity, an employer must show that the challenged practice bears a manifest relationship to the employment at issue; i.e., that the practice is related to job performance. *Teal*, 457 U.S. at 446, 102 S.Ct. at 2530; *Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251, 1259 (6th Cir. 1981).

19. The City has the burden of demonstrating that the 1983 written and physical components of the examination are valid and job related in accordance with standards of the psychological profession.

20. Because important aspects of the job analysis were not performed as the test was being developed, but were instead prepared in contemplation of litigation, the job analysis is suspect. Studies done *post hoc* in an attempt to validate a test already given are inherently suspect due to a danger of lack of objectivity. *Albermarle*, 422 U.S. at 433, 95 S.Ct. at 2379, n. 32. However, this fact alone does not require a finding that the validation procedures are invalid.

21. The defendant did meet its burden of demonstrating business necessity for the use of the 1983 firefighter entry-level written component of the examination. The City proved that the examination was developed, administered and scored in an acceptably professional manner consistent with the Uniform Guidelines, APA Standards, or Division 14 Principles.

22. The Uniform Guidelines require that a selection device having a disparate impact be operationally validated for the use to which it has been put, and that an employer must show "that a higher score ... is likely to result in better job performance" in order for scores to be used in rank order. *Uniform Guidelines*, 29 C.F.R. § 1607.14(C)(9).

23. The City has demonstrated that the 1983 entry-level firefighter examination ad-

equately reflected the important aspects of the job of firefighting and that the 1983 test scores varied sufficiently with job performance to warrant rank-order hiring of firefighters.

24. The use of the results of the 1983 entry-level firefighter examination to rank order applicants is valid and job-related in that the evidence showed that a higher score on the physical components of the examination correlates to a more successful job performance.

25. The job relatedness and utility of the 1983 examination has been demonstrated to be strong enough to justify rank ordering.

26. The 1983 examination is content valid.

27. The 1983 examination is valid based upon construct validity.

28. The 1983 examination is valid based on criterion validity.

29. The City has met its burden of proving the 1983 examination to be a valid predictor of successful job performance.

30. The City has shown that the 1983 selection procedure taken either as a whole, or by its individual components, is valid for its intended use.

31. The scoring of the 1983 examination and the resulting eligibility list were proper mechanisms for selection of firefighters.

32. Cutoff scores can properly "be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force. Where applicants are ranked on the basis of properly validated selection procedures and those applicants scoring below a higher cutoff score than appropriate in light of such expectations have little or no chance of being selected for employment, the higher cutoff may be appropriate, but the degree of adverse impact should be considered." *Uniform Guidelines*, 29 C.F.R. § 1607.5(H).

33. The Uniform Guidelines should always be considered in determining the validity of a test, but they should not be regarded as conclusive evidence thereof

unless reason and statutory interpretation support their conclusions.

34. The Uniform Guidelines are persuasive, but they are not law.

35. The raw scores used to establish the eligibility lists generated from the 1983 entry-level firefighter examination were valid because they were based on evidence that the scores are predictive of successful job performance.

36. The weighing of the written and physical components of the 1983 entry-level firefighter examination was valid and job-related.

37. The City does not have a policy of denying females equal opportunity of employment as firefighters within the Fire Department.

38. The 1983 firefighter entry-level examination was not designed to discriminate against females.

39. A specific measurement of stamina or aerobic capacity is not required in order for a firefighter examination to be valid and not vulnerable to a Title VII challenge. *Berkman v. City of New York*, 812 F.2d 52, 59–60 (2nd Cir.1987).

40. Both aerobic and anaerobic qualities are important to firefighters. Anaerobic qualities are more important than aerobic qualities. It is not necessary that an aerobic test be a part of the physical portion of the examination in order for the examination to be valid and job related. Aerobic qualities may be tested independently by a step test, stress test, or other similar activity. This may be a part of the medical examination. In any event, aerobics should be tested before a person is placed on the eligibility list. The failure to have the aerobics as a portion of the physical examination process does not invalidate the examination. It may be given after the written and physical portions of the examination.

41. A decision by the City to adopt an affirmative action plan that would provide for a dual list of men and women for entry-level firefighters and which would provide for a number of women to be hired as entry-level firefighters is an administrative and policy decision and is not a legal

requirement. Whether the City uses a rank-order system or a pass/fail system with random selection is an administrative and policy decision and is not a legal requirement.

42. Plaintiffs failed to establish the existence of an alternative selection device which has comparable utility as the 1983 examination, and would have a less adverse impact on either test scores or the hiring rate of women.

43. Plaintiffs have failed to prove the existence of a selection procedure of equal validity which would have a less adverse impact upon the selection rate of females.

44. The City has shown that the 1983 firefighter examination is valid for its intended use. Accordingly, an order to that effect will be entered.

45. The plaintiff, United States Government, in the pattern or practice case proved in its *prima facie* case that there was a disparate impact. The defendant proved that its test was job related and not discriminatory. The plaintiffs did not prove pretext which would nullify or require a declaration that the defendant's test was discriminatory and not valid. The plaintiffs did not demonstrate that there was an alternative job related test that would result in the probability of women ranking high enough to be considered for employment as entry-level firefighters.

46. In Case No. C83–2484, the plaintiffs did not prove that the defendant discriminated against women applicants for entry-level firefighters. Plaintiffs failed to prove that the 1983 entry-level written and/or physical examination was not job related. Plaintiffs failed to prove that the 1983 entry-level written and/or physical examination was discriminatory against women.

47. In Case No. C83–4998, the plaintiffs failed to prove that the defendant engaged in a pattern and practice of discrimination against women applicants for entry-level firefighters. The plaintiffs failed to prove that the 1983 entry-level written and/or physical examination for entry-level firefighters was not job related. Plaintiffs failed to prove that the 1983 entry-level written and/or physical examination for firefighters was discriminatory against women.

CONCLUSION

1. Cities should be aware of the teachings of *Brunet, Berkman,* and the present action.

2. Cities should design and administer firefighter entry-level examinations that are job related and are not discriminatory against women.

3. In the area of validation, the cities should validate their examinations, both written and physical, as soon as possible. Ideally, validation should be done after the test is designed and before it is given. This is not feasible because of the security of the examination. This validation system is done by administering the test to a number of current firefighters. Their test results are compared with their training academy records and their on-the-job performance ratings and other experiences. It is not ideal because the present firefighters do not always take the test seriously. Also, performance ratings are very subjective. While this is not the ideal method, it is the best available method.

4. Some cities use rank-order hiring and other use a pass/fail method coupled with random selection hiring from the list of those passing the examination. If municipalities want to continue to use rank-order hiring, they may do so but they should be made aware of the fact that rank-order hiring is coming under increasing attack. For those using rank-order hiring, cities must make sure that they can demonstrate that there is a probability that those with the higher rank would be better firefighters than those with the lower rank. If this cannot be demonstrated, it will be argued that rank order is not a valid method of hiring and thus is discriminatory.

5. If cities are serious about wanting to hire the best qualified persons for firefighters and still hire women firefighters, they must engage in long-range, meaningful recruitment and training programs to get women interested in becoming firefighters and to train them for firefighting tasks. A mere announcement of policies stating that

a city will not discriminate against women in hiring firefighters is not enough. Cities know, or should know, that if they want the best qualified firefighters and use a rank-order system, very few, if any, women will qualify at the present time and will not be hired in any significant number because they generally cannot compete with men physically.

6. For those women interested in becoming firefighters, they must know and understand what is necessary to become firefighters and they must train accordingly.

7. During the trial of this case, this Court was inundated with statistics and opinions of experts, including statisticians, industrial psychologists, and exercise physiologists, as well as the opinions of unsuccessful applicants for firefighting positions and present firefighters. The written and physical components of the examination were designed, came under attack, and then were validated. This Court believes, after reading all of the reported cases on the subject, listening to all of the witnesses, and reviewing all of the exhibits, that any entry-level examination can be attacked and conclusions reached by witnesses that the examination has an adverse impact, is not job related, and is discriminatory. The courts are faced with picking and choosing from the testimony and exhibits of the various experts. This procedure is not an exact science, and it appears to this Court that any and all tests can be subject to attack, with some credible evidence.

8. In May of 1985, during the pendency of this action the City desired to hire some additional firefighters. This Court used its persuasive powers and was instrumental in getting the City to agree to hire ten women firefighters, the first women firefighters in the City's history. The experiences of these women over the last several years should go a long way in helping the cause of women who want to become firefighters. Their test scores in the written and physical components of the examination administered in 1983, together with their academy training records, job evaluations and experiences should prove helpful.

Based on the foregoing, the Court shall enter judgment for the defendant, City of Cleveland, and against the plaintiffs in Case No. C83–2484.

The Court shall enter judgment for the defendant, City of Cleveland, and against the plaintiff, United States of America, in Case No. C83–4998.